UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,  )
                           )
        Plaintiff,         )
                           )        **Ind #1:22 Cr. 606-001 (PGG)**
              v.           )
                           )
JAMES ZHONG,               )
                           )
        Defendant.         )


**SENTENCING MEMORANDUM SUBMITTED
ON BEHALF OF JAMES ZHONG**


Michael Bachner, Esq.
Bachner & Associates, PC
111 Broadway, Suite 701
New York, NY 10006
O:  (212) 344-7778
F:  (212) 344-7774
Email: mb@bhlawfirm.com

Donald F. Samuel
Email: dfs@gsllaw.com
John A. Garland
Email: jag@gsllaw.com
Amanda Clark Palmer
Email: aclark@gsllaw.com
Garland, Samuel & Loeb, P.C.
3151 Maple Drive
Atlanta, GA 30305
Work: (404) 262-2225

## I.   PRELIMINARY STATEMENT

In 2012 Jimmy Zhong stole around $620,000 worth of Bitcoin from Silk Road. Over a decade later most of that Bitcoin along with other Bitcoin is under the Government's control and is worth between $3.39 and $1.4 billion.

In September 2012, at the age of just 22, Mr. Zhong, known as "Jimmy," accidentally found and then intentionally exploited a simple flaw in the illegal Silk Road website.  In a few hours spread out over just two days, Jimmy stole around 50,000 Bitcoin from the Silk Road website valued at that time at around $620,000. Jimmy took the Bitcoin from Silk Road with no planning, and little effort other than creating multiple user accounts and rapidly clicking the withdraw button.  Jimmy stopped the withdrawals on his own accord even though he could have continued to acquire additional Bitcoin undetected.

While Jimmy had no right to take the Bitcoin from the "victim" (Silk Road and/or Ross Ulbricht), it is equally true that they had no right to possess the Bitcoin in the first place.  Silk Road and Ross Ulbricht are not financial victims in the true sense of the word under the Mandatory Victims Restitution Act.

After Jimmy took the Bitcoin from Silk Road, Ross Ulbricht contacted Jimmy over the Silk Road messaging service and asked him to explain how he accessed the Bitcoin.  After Jimmy told him what he did, Ulbricht never asked Jimmy to return

the coins. Rather, he thanked Jimmy for his candor and sent him, unsolicited, additional Bitcoin. Silk Road's response to Jimmy's conduct is hardly the response of a victim.

Jimmy is the product of a dysfunctional family and childhood. His parents, who divorced when Jimmy was in high school showed him no love or parental concern. Jimmy cannot remember the last time he exchanged a word with his sister. From childhood until high school, Jimmy was severely bullied and victimized by his peers because he was different - he was extremely shy, overweight, and most significantly, suffered from undiagnosed autism spectrum disorder. Having no friends or family he could turn to, Jimmy found solace and friendship in the world of his computer. Well over a decade ago, with the onset of the cryptocurrency market, Jimmy successfully mined bitcoin and made his first very substantial income.

As discussed below, when Jimmy's misconduct is viewed in the context of its unusual circumstances and his personal history, there are compelling reasons to impose a non-prison sentence coupled with community service, mental health treatment, and if necessary, a term of home confinement.

## II.   THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) AS APPLIED IN THIS CASE STRONGLY SUPPORT A VARIANCE.

The overarching sentencing principle behind Section 3553(a), often called the

parsimony clause, is that a sentencing court "*shall impose a sentence sufficient but not greater than necessary*" to meet the goals of sentencing. (emphasis added).[1]

Subparagraph 2 of Section 3553(a) directs that "[t]he court, in determining the particular sentence to be imposed, shall consider" the following factors relevant here:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—

    (A) to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with . . . medical care . . . in the most effective manner;

(3)    the kinds of sentences available; and …

(4)    the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

---

[1] The parsimony clause was originally part of the House sentencing reform bill and was later added to the Senate resolution and adopted in committee.  The clause was "not just another 'factor' to be considered along with others in § 3553(a) – it sets an independent limit on the sentence a court may impose.  David L. McColgan & Brett G. Sweitzer, *Grid & Bear It*, *29 Champion 50, 50 (2005); see also United States v. Foreman,* 436 F.3d 638, 644 (6th Cir. 2006)(court mandated to impose sentence sufficient but not greater than necessary to comply with purposes behind § 3553(a)); Richard S. Frase, *Punishment Purposes,* 58 Stan. L. Rev. 67, 83 (2005) (stating that the "structure of section 3553(a)," which lists the parsimony clause first, suggests strongly that this principle "sets overall limits on the crime-control and other purposes which follow.")

(7)   the need to provide restitution to any victims of the offense.

The factors enumerated in Section 3553(a) are the "bedrock of all federal sentencing". *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014).  In crafting the proper sentence, the "district judge should . . . consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." In so doing, the judge "must make an individualized assessment based on the facts presented." *United States v. Davalos*, 2008 WL 4642109, at *1 (S.D.N.Y. Oct. 20, 2008) (quoting *Gall v. United States*, 552 U.S. 38, 40 (2007). "A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not." *United States v. Ramirez*, 2009 WL 4722237, at *2 (S.D.N.Y. Dec. 4, 2009).

Below we discuss the § 3553(a) factors as they apply to Mr. Zhong' upcoming sentencing.

**a.  18 U.S.C. § 3553(a)(1): The Nature and Circumstances of the Offense.**

   i.  Jimmy's Brief Walk into the Silk Road

As reported in the PSR, the Silk Road was an online darknet black market that was in operation from about 2011 through 2013.  It was created and operated by Ross William Ulbricht to cater mostly to persons engaged in various forms of illegal

5

conduct, including the purchase and sale of illegal drugs. In February 2015, Ulbricht was convicted of numerous charges and was sentenced on May 29, 2015 to life imprisonment plus 40 years. (PSR ¶¶ 7-9). The only form of payment accepted on the Silk Road site to pay for its services was Bitcoin. In order to make a purchase through Silk Road, the "user" had to first fund his account with Bitcoin which remained in escrow pending completion of the transaction. (PSR ¶¶ 11-17).

Sometime in 2012, when Jimmy was 21 years old, he began using the Silk Road website to purchase personal use amounts of cocaine during a time in his life when he used cocaine regularly on the weekends. After one or two Silk Road transactions, however, Jimmy decided he no longer wanted to make purchases on the site and opted to withdraw his Bitcoin. While doing so, Jimmy accidentally double-clicked the withdraw button and was surprised to discover that it resulted in a serendipitous withdrawing of double the amount of Bitcoin. Jimmy, having stumbled into this flaw, took advantage of it over a brief period—essentially a few hours of work spread out over two days. Jimmy took the Bitcoin from Silk Road with no planning, and little effort other than creating multiple user accounts and rapidly clicking the withdraw button. He promptly stopped the withdrawals on his own accord though he could have easily continued to acquire additional Bitcoin undetected. Moreover, Jimmy never encouraged, counselled, or taught others how

to take Bitcoin from Silk Road.

Within a few days after Jimmy stopped withdrawing the Bitcoin, he was unexpectedly contacted by Ulbricht over the Silk Road messaging service and asked how he obtained the Bitcoin.  Jimmy explained the flaw to Ulbricht, who, in turn, unsolicited, sent Jimmy additional Bitcoin as a "thank you" for explaining the fault in the site.  That Ulbricht never demanded that Jimmy return the Bitcoin and even sent him additional Bitcoin as a "thank you," added to Jimmy's belief that while his conduct was wrong, there was no real "victim."

Jimmy committed a crime. He is remorseful for having done so. Yet, the seriousness of Jimmy's crime, or any crime is deeply intertwined with the nature of the harm caused.  Here the "harm" is to Ulbricht who only obtained control over the Bitcoin by his criminal scheme for which he is serving two life sentences plus 40 years.[2]  Ulbricht never had any right to possess the Bitcoin and is not a "victim" in the true sense of the word.  The "harm" to Ulbricht is of a fundamentally different character than the harm caused in other cryptocurrency theft cases involving innocent victims.  Here, no investor was misled and no diversion of funds for improper purposes occurred.  No one lost the fruits of his or her hard labor.  No

---

[2] While Jimmy had no right to take the Bitcoin from Silk Road, once he did, it would also have been unlawful for Jimmy to return it to Ulbricht even if he had wanted to.

retiree lost his or her nest egg.  No family lost the ability to pay the home mortgage. No parents lost their ability to send their kids to school.   Certainly, the Government and society in general have a strong interest in protecting innocent victims and deterring crimes against them.  By contrast, there is far less Government or societal interest in protecting the financial well-being of drug dealers like Ulbricht or individuals who used the site for nefarious purposes.  Still, Jimmy fully appreciates the wrongfulness of his conduct – that he had no right to the Bitcoin - and will never again engage in illegal conduct.

ii.  Use and preservation of the Silk Road Bitcoin

It was not until 2017, five years after the withdrawals from Silk Road, that Jimmy eventually used some of the Silk Road connected Bitcoin.[3]  Jimmy preserved around 96%, or 51,351.89785803 of the total 53,500 Silk Road Bitcoin, despite having complete control over it for almost a decade.  Of the missing 4%, Jimmy used about 3% for personal and business purposes, and gave away around 258 Bitcoin as gift to friends and around 250 Bitcoin were stolen from his home. Jimmy also reported all Bitcoin sales, whether connected or unconnected to Silk Road, on his tax returns.

---

[3]  Prior to 2017, all of Jimmy's income was derived from the sale of legitimately obtained Bitcoin. Even after Jimmy began using the Silk Road connected Bitcoin in 2017, he continued to derive a significant amount of his income from the sale of Bitcoin unconnected to Silk Road.

The steps Jimmy took to conceal his control over the Bitcoin were neither complex nor did they require technical brilliance.   Jimmy created multiple usernames on Silk Road to withdraw the Bitcoin.  Like every user of Silk Road, he did not use his true name for the usernames. Later Jimmy sent a small percentage of the original Bitcoin through a Bitcoin mixer that made those 750 Bitcoin harder to trace. Jimmy also converted the Bitcoin Cash he received in 2017 into Bitcoin making the Bitcoin generated in the conversion harder to trace back to Silk Road.[4] It is also true that Bitcoin is inherently semi-anonymous. Yet that semi-anonymity is a built-in feature of Bitcoin, not something Jimmy created. The overwhelming majority of the Bitcoin simply sat on the Bitcoin Blockchain such that anyone could have traced it back to Silk Road with any of the many publicly available web-based blockchain explorers.

### iii.  Turning over control to the Government

The Government notes that Jimmy waited around four months from the date of the search to turn over control of the Bitcoin to the Government.[5]  There were multiple reasons for this short delay.  Defense counsel needed time get up to speed

---

[4] Jimmy converted the Bitcoin Cash to Bitcoin because felt that Bitcoin would be more valuable in the long run.  Jimmy was right and that decision resulted in Government recovering more value (tens of millions of dollars' more in value) than the Government would have received had Jimmy not converted the Bitcoin Cash to Bitcoin.

[5] Govt. response to Defense PSR objection.

9

on the facts of the case.  The Defense needed to hire its own forensic expert to trace and separate the Silk Road Bitcoin from the Bitcoin Jimmy acquired legitimately— no easy task.  Defense counsel needed to research, given the civil resolution reached in a similar case, whether a crime had even been committed.  Further, not long after the search warrant was executed at his home, Jimmy directed counsel to reach out to the government to begin negotiating a resolution of his case.  However, the Government, like the defense, also needed time to get up to speed.  Once the Government was ready to meet, defense counsel posited to the Government that to avoid disparity in treatment, Jimmy's case should be resolved civilly, as was done in a similar case in California, or through a deferred prosecution agreement.  In support, the defense presented several strong legal and factual arguments to mitigate Jimmy's culpability.  Only a few days later, before any decision was rendered by the Government, Jimmy gave the government control over the Silk Road related bitcoin.

Although the Government had seized the physical device needed to control most of the Bitcoin, the Government had no way to use that device to control the Bitcoin without Mr. Zhong's cooperation. Jimmy gave the Government, with no promise of anything in return, the keys and tools needed to take control of billions of dollars' worth of Bitcoin—control that the Government would not have been able to gain without Jimmy's cooperation.

As Jimmy has gone through the multistep process of giving the Government

control of the Bitcoin he has repeatedly proven – through his actions – his good faith desire to aid and cooperate with the Government.  Jimmy decrypted files needed to access the Bitcoin, provided the Government the private keys to Bitcoin on the blockchain, provided copies of Bitcoin wallets (and their passwords) to access those wallets, spent days and days over the course of weeks extracting Bitcoin from lighting nodes, identified Bitcoin in interest bearing online accounts and sent it to the Government, and even gave the Government control over around 14 Bitcoin unconnected to Silk Road  (worth around $390,000 at today's Bitcoin price of around $28,000 a Bitcoin).  At any point prior to or during the process Jimmy could have fled with the keys, yet he chose to stay and cooperate with the Government.

  iv.  Financial benefit to the Government

  The Government has not been harmed by Jimmy's actions which took place almost a decade ago when he was just 21 years old. Instead, the Government will benefit enormously from his return of the Bitcoin. In 2012 when Jimmy took the Bitcoin from Silk Road, it had a value of around $620,000, a small fraction of the value of the Bitcoin the Government seized and currently possesses.  On the day of the seizure, the Bitcoin was worth around $3.39 billion—almost 5.5 thousand times more than when Jimmy took it from Silk Road in 2012.  On the date of this filing the Bitcoin is worth about $1.44 billion—over 2.3 thousand times more valuable than on the date Jimmy took it from Silk Road.

But for the Government's hard work in its investigation, there would be no financial benefit to the Government.  However, it is also true that there would have been no benefit, or one that was substantially smaller, had Jimmy not taken the Bitcoin from Silk Road back in 2012.  Assuming that the Bitcoin had not already been dissipated by Ulbricht, the Government would have seized about 50,000 Bitcoin back in 2013 when it shut down Silk Road.  The Government then would have sold the Bitcoin at auction in 2014 for around $16.7 million.[6]  However, that did not happen and the Government now has obtained control over exponentially more value than it would have had the Bitcoin been sold at auction in 2014 - ranging from over 200 times more value (based on the total Bitcoin value of about $3.39 billion on the seizure dates) to about 86 times more value (based on the total Bitcoin value of around $1.44 billion on today's date).

The staggering financial benefit to the Government is the result of:

- Jimmy's taking the Bitcoin from Silk Road back in 2012, preventing Ulbricht from dissipating it.

- Jimmy's preservation of about 96% of the Bitcoin for almost a decade.

- The dramatic increase in value of Bitcoin since 2012.

---

[6] In 2013 the Government shut down Silk Road and seized 144,336 Bitcoin from Silk Road, selling the Bitcoin in 2014 for $48,238,116 (average of $334 a Bitcoin). https://www.justice.gov/usao-sdny/pr/acting-manhattan-us-attorney-announces-forfeiture-48-million-sale-silk-road-bitcoins

- Jimmy's foresight back in 2017 to convert the Bitcoin Cash to Bitcoin.[7]

- Jimmy's cooperation with the Government, with no promise of anything in return, giving the Government the ability to control billions in dollars' worth of Bitcoin that the Government would not have been able to control without Jimmy's cooperation.

The financial benefit to the Government of Jimmy seizing and holding onto the Silk Road Bitcoin is shocking and difficult to put in perspective.  For example, the value of the Bitcoin when seized by the government of about $3.39 billion, was more than the 2021 annual GDP of almost half the counties in the state of New York.[8]  Even at the value of the Bitcoin today, of about $1.44 billion, it is worth more than the 2021 annual GDP of seven of New York's counties.[9]

While Mr. Zhong's conduct was criminal, this Court should keep in mind that there is no true financial victim here; that while Jimmy financially benefited from his wrongdoing he still preserved and grew the majority of the asset; and that the

---

[7] Jimmy received 50,000 Bitcoin Cash in the 2017 Bitcoin Cash hard fork. Jimmy then converted all 50,000 BCH to Bitcoin.  Jimmy thought Bitcoin would be a better long-term investment than Bitcoin Cash and he was right.   While Jimmy dissipated a significant amount of the Bitcoin he obtained from the conversion, the Bitcoin remaining from that conversion and obtained by the Government, is tens of millions dollars more valuable than the full 50,000 Bitcoin Cash would be valued today.   Further, had Jimmy not taken the Bitcoin from Silk Road the Government would not have been able to benefit from the 2017 Bitcoin Cash hard fork at all.

[8] https://www.bea.gov/data/gdp/gdp-county-metro-and-other-areas

[9] *Id.*

13

U.S. government and the taxpayer will sustain an enormous financial benefit from the return of the Bitcoin.

**b.  18 U.S.C. § 3553(a)(1): the history and characteristics of the defendant.**

It is no accident that the first criterion under § 3553(a) – The Nature and Circumstances of the Offense *and* The History and Characteristics of the Defendant - was drafted by Congress in the conjunctive.  In imposing a fair and just sentence, justice dictates that the crime committed by a defendant should not be viewed separately in a vacuum but in light of the defendant's unique history and humanity. It has long been recognized that a defendant's character is always "a central consideration in the fashioning of a just sentence." *United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir. 1993). As the respected jurist, the Honorable Jed S. Rakoff so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant'.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). The U.S. Supreme Court has voiced similar views *See Gall v. United States*, 552 U.S. 38, 52, 128 S. Ct. 586, 598 (2007) ('"It has been uniform and constant in the

federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue'" (quoting *Koon v. United States*, 518 U.S. 81, 113, (1996)); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4 (sentencing court not limited regarding the information about a defendant's background, character and conduct that it may consider when imposing an appropriate sentence).

   i.  <u>Autism spectrum disorder diagnosis</u>

Upon first meeting with Mr. Zhong, defense counsel was immediately concerned about his emotional functioning. In March 2022, counsel arranged for Jimmy to undergo an independent psychological analysis by Matthew W. Norman MD.  Dr. Norman's report and findings, dated March 31, 2022, is attached as Exhibit A (hereinafter the "Norman Report").   Dr. Norman's report confirmed defense counsel's concerns, and concluded that Jimmy's symptoms are consistent with autism spectrum disorder, which

> is recognized in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5). Autism Spectrum Disorder is recognized as a continuous and life-long developmental disorder characterized by severe and sustained impairment in social interaction and the development of restricted repetitive patterns of behavior, interests, and activities without other language and cognitive developmental delays.

*Id.* at 8.

    ii.  <u>Jimmy Zhong's formative years</u>

Jimmy Zhong was born on May 24, 1990 in New Jersey to the marital union of Sheng (father) and Xiaohui Zhong, both Chinese nationals. Jimmy has a younger sister, Crystal, age 26.  From a very young age Jimmy's relationship with his parents was severely strained. His parents fought continuously.  For all intents and purposes, Jimmy grew up without any parental guidance, care, or affection. Jimmy barely knew his father who spent his waking hours at his thrift-type shop where he bought and sold cheap goods. (PSR ¶ 83)  Jimmy's mother was a nurse who worked the night shift and slept during the day. She provided Jimmy with no maternal attention or affection.  According to Dr. Norman's report, Jimmy stated that his parents "'were never there' and '[t]hey never seemed to care.  They were never nice.  I got out of there as soon as I could.'"  (Norman Report, p. 2).  Jimmy's relationship with his sister, Crystal, was no different. "'I never had a relationship there either.'" *Id.*  Jimmy has no idea where Crystal is today or if his mother or sister are even aware of his current legal predicament. (PSR ¶ 82)   Jimmy described his childhood as "miserable" and without any enjoyment.  It was a time period he "tried to block out." (PSR ¶¶ 83-84)

Jimmy believes his parents divorced when he was in middle school or high

school.[10] Jimmy's father provided no financial support to the family. Although Jimmy continued to reside in his mother's home, he had no relationship with her and he was essentially a stranger in his own home.

Jimmy never learned the skills necessary to develop friendships with others. This is no surprise since Jimmy never developed a relationship with his own parents, who, in turn, never socialized with others.   With his undiagnosed autism and the total absence of the skills necessary to develop social relationships, Jimmy did not fare well in lower school or in high school. In fact, beginning as far back as elementary school in Cobb County, Georgia, Jimmy was unable to fit in with the other children.  Jimmy reported to Dr. Norman that he was "bullied starting at an early age . . .  He 'couldn't go anywhere and had no friends.'" *Id.* at 2.  Jimmy described his childhood to Dr. Norman as "'crappy.  I got picked on a lot.  I never made any friends.  I still have few friends.'"  Jimmy was made fun of as "'[b]eing fat.  Being ugly.  Being weird.'"  *Id.,* at 3.  The lack of love he had at home was leveraged by the ridicule and abuse he suffered in school before college.  Jimmy was routinely tormented by his school peers, including publicly having his pants pulled down at a football game and being punched for no other reason than to brutalize him

---

[10] For most children, a divorce is a traumatic event not easily forgotten.  For Jimmy, given his parents' absence from his life, their divorce was of very little, if any significance to him. Jimmy learned that his father died sometime in 2022.

emotionally and physically. *Id.* It was this mistreatment and the absence of parental and familial love or just attention that catalyzed Jimmy to hide in his room and focus on his computer skills. As reported by Dr. Norman, for Jimmy the "computer provided an escape to his school and home-life angst.  He 'got on the computer every single day.'  He learned to program [computers] in middle school. . . . He [Jimmy] "spontaneously reported that the computer allowed him to fantasize about 'making up the perfect life or something.'" *Id.*

Academically, Jimmy did very well in high-school, and in the fall of 2008, at the age of 18, he entered the University of Georgia on a HOPE scholarship.[11]   Jimmy has not spoken with his parents or his sister since he left for the University. Jimmy's hope that his parents would "'show some attention'" due to his academic success was unavailing *Id.*  at 3.

### iii.  College to the present

At about the time he entered University, Jimmy learned about Bitcoin mining, and in around 2009, he mined "'a couple of hundred coins per day.'" *Id.*[12]  Finally

---

[11] The HOPE Scholarship is available to Georgia residents who have demonstrated academic achievement to assist with educational costs of attending postsecondary institution in Georgia. https://finaid.gatech.edu/undergraduate-types-aid/hope-scholarship#:~:text=The%20HOPE%20Scholarship%20is%20available,in%20the%20state%20of%20Georgia.

[12] Bitcoin mining is the process by which new bitcoins are entered into circulation. It is also the way the network confirms new transactions and is a critical component of the blockchain ledger's maintenance and development. "Mining" is performed using sophisticated hardware that solves

unleashed with money but without proper coping skills, Jimmy drank excessively, at times till he blacked out, and to fit in, used cocaine on weekends for several years.[13]  He displayed large amounts of cash futilely hoping to impress people – particularly women.  He gave away bitcoin as gifts - worth almost $3 million based on the Bitcoin value at the time. Still, few of these ersatz friendships lasted. Jimmy believes that other than a few remaining friendships, the majority dissipated with his wealth. *Id.*at 4. Jimmy has never been married, and reports having no close female relationships.  He lives alone in Georgia in a modest home with his elderly dog. Before the seizure of the Bitcoin, Jimmy always supported himself through bitcoin mining and related transactions.  Since his arrest, Jimmy has worked as a Lyft and Uber driver and has started and developed a CNC metal cutting business with multiple clients that has grown and is showing great promise.

iv.  Character letters

Typically, in a sentencing memorandum counsel attaches many letters of support from a defendant's family and friends describing his/her very personal reasons for asking your Honor to temper cold justice with warm mercy when

---

an extremely complex computational math problem. The first computer to find the solution to the problem receives the next block of bitcoins and the process begins again. https://www.investopedia.com/tech/how-does-bitcoin-mining-work/

[13] Jimmy has a DUI and simple drug possession arrest.  The latter has been expunged.

imposing sentence.   Unfortunately, Jimmy has no family. A handful of people, however, who have remained his close friends, have written letters on his behalf to this Court describing Jimmy laudatorily.[14]

Alexa Pisczak, now an attorney, met Jimmy in 2008 during her freshman year at the University of Georgia.   They have remained close friends over the past 15 years. In her letter, Ms. Pisczak describes Jimmy's kind and caring nature, fostered despite the hardships he experienced growing up:

> I'm taking the time to write this letter because I want you know that Jimmy is one of the best people I know. Jimmy is the type of person who will do anything for anyone (friend or stranger) if they need help. For the last 15 years, Jimmy has been someone I can call and depend on when my car breaks down, my tech crashes, I need someone to cry or vent to, I need a ride or I need help with anything else. It doesn't matter if Jimmy is busy or not, he is always willing to help others and never complains or expects anything in return.
>
> Jimmy has always been kind to everyone who I've seen him interact with, and he always wants people to be happy and to have a good time. I've never heard anyone who knows Jimmy say anything negative about him or his character. Although Jimmy is human and makes mistakes like everyone else, he is a good person to his core.
>
> Jimmy has always been extremely hard working, and I admire his perseverance because his life hasn't been easy. Jimmy has had to support himself financially, physically and emotionally since high school. He's had to figure out how to do almost everything himself and without a family support system. Despite not having the support that many of us are so lucky to have while growing up, Jimmy is one of the smartest, handiest and most caring people I know too. I feel

---

[14] Several of the people who wrote letters previously received gifts of Bitcoin from Jimmy that unbeknownst to them (and at times Jimmy) included Bitcoin obtained from Silk Road.

fortunate to have him as a close friend. (Ex. B)

Julian Pisczak is Alexia's husband and has also known Jimmy Zhong for 15 years.  Mr. Pisczak knows Jimmy to be a friend with a "good heart," who acts with "integrity" and "respect" for others:

> Jimmy has always conducted himself with integrity and has always showed respect to others he interacts with. He has always treated me with respect and dignity, and I have not seen him belittle others regardless of their relationship to Jimmy. I value my friendship with Jimmy greatly. He has always been available to talk when I needed someone to vent to. He has always been willing to assist to help me move, build furniture, fix my electronics and lawn equipment, and never expects anything in return. He treats me with dignity and compassion and I am thankful to call him a friend.
>
> Throughout the years, I have seen Jimmy develop new friendships and I have always seen Jimmy treat new friendships with respect. Jimmy treats each of his friends the same, and I have admired Jimmy for being such a great friend who is willing to listen and consider their feelings and perspectives.
>
> In conclusion, I wholeheartedly endorse Jimmy and can vouch for his character without hesitation. He is a genuine person who loves hangout out with friends, is always willing to lend a hand when a friend is in need, would be the first person to volunteer to help if asked, and has always been a hardworking man. Jimmy will be a friendship I have for the remainder of my life and I consider Jimmy to be one of my closest friends. Jimmy is an incredible, intelligent human being who continues to enlighten those around him and I am proud to call him my friend.  (Ex. C)

Hannah Hecker is a Legal Assistant at an Atlanta-based law firm.  Ms. Hecker describes Jimmy as "the most loyal, caring and empathetic individual I have ever met. There is nothing he would not do for those he loves, and I know this from

experience. . . . My heart goes out to Jimmy because all he wants in this life is to love others and for others to love him." (Ex. D)

Christina Elizabeth Ross is a cardiology nurse practitioner and has known Jimmy since 2014. In her letter to this Court, Ms. Ross describes the caring and emotionally altruistic person she knows Jimmy to be despite the serious obstacles he faced growing up:

> I met Jimmy Zhong in 2014 through my boyfriend at the time . . . Jimmy has been the best friend I have ever had. Ever since I met him, he would drop what he is doing to go help any of his friends in time of need. . . . I eventually got married in 2018 and Jimmy was the Best Man in our wedding. Jimmy has been there for me during difficult times and times of trouble including my divorce and getting through school. I always know that I can count on him to be there for me during times of need. My ex-husband had mental health issues that lead to hospitalizations and at the drop of a dime Jimmy would drive over 2 hours to get to us when called whether it was to just be there for us emotionally or to help take care of our dog while I was at the hospital . . . Jimmy has helped me move numerous times because I never hired movers. I do not know too many people that would be willing to help pack up their house and help them move.

> I heard over the years that Jimmy had a rough childhood and had to fend for himself at a very early age. I grew up in a very tight-knit family and could not believe when I found out that he never celebrated Holidays and his family never celebrated his birthday. His mother and father were never there to support him and were not even present for his Graduation ceremony from the University of Georgia. My family and I took Jimmy under our wing and consider him as part of our family. Over the years, he has come to celebrate holidays like Thanksgiving and Christmas with us. He is such a kind soul and I am thankful to know him and call him one of my very best friends.

I strongly believe that I would not be where I am today without his constant love, friendship, and support. (Ex. E)

For the reasons set forth above and those discussed below, we respectfully ask that Your Honor impose a non-prison sentence on Mr. Zhong.

**c. 18 U.S.C. § 3553(a)(2)(A): the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense.**

Here, a non-custodial sentence adequately considers the seriousness of the offense based on the unique facts here, as detailed above, promotes respect for the law and provides just punishment for the offense. With retribution, society considers the offender's degree of blameworthiness and the amount of harm done and imposes punishment accordingly. *See* Hon. James S. Gwyn, *Juror Sentiment on Just Punishment: Do Federal Sentencing Guidelines Reflect Community Values?* Harvard Law Review and Public Policy Review, 2010 [Vol.4.p.173-200]. Public opinion polls reveal that prison terms are unnecessary to promote respect for the law or to appropriately punish an offender. *Id.* at 175. (The median juror recommended sentence was only 19% of the median Guidelines ranges and only 36% of the bottom of the Guidelines ranges). Studies have shown that the median Guidelines range was more than 10 times greater than the median juror's recommendation. In fact, in a study of 261 cases, jurors recommended a sentence significantly lower than the Guidelines 90% of the time. *Id.* at 187-188. This strongly suggests that the

Guidelines may overstate the importance of punishment at the expense of other sentencing factors.

**d. General Deterrence - 18 U.S.C. § 3553(a)(2)(A): the need for the sentence imposed to promote respect for the law & 18 U.S.C. § 3553(a)(2)(B): the need for the sentence imposed to afford adequate deterrence to criminal conduct.**

Imposing a reduced sentence of incarceration aligns with the *general deterrence* purposes mandated under § 3553(a). Indeed, research has consistently shown that, while the certainty of being caught and the swiftness in imposing punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006); *See also United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the *duration* of incarceration provides little or no general deterrence for white collar crimes."). "Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence." *Id.*; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflt. Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity"); Anthony N. Doob & Cheryl Marie Webster, *Sentencing Severity and Crime: Accepting the Null Hypothesis,* 30 Crime & Just. 143 (Univ. Of Chicago 2003) (arguing that severity of punishment does not deter crime); Jeffrey Grogger, *Certainty v. Severity of*

24

*Punishment*, 29 Econ. Inquiry 297, 308 (1991) (concluding increased certainty of punishment generates significant deterrent effects while increased severity produces insignificant results); William N. Trumbull, *Estimations of the Economic Model of Crime Using Aggregate and Individual Level Data,* 56 S. Econ. J. 423, 427-37 (1989) (analyzing data to conclude certainty of punishment has greater deterrent effect than severity); Ann Dryden Witte, *Estimating the Economic Model of Crime with Individual Data,* 94 Q.J. Econ. 57, 81-83 (1980) (maintaining certainty of punishment produces greater deterrent effect than severity of punishment).

Moreover, a reduced sentence of probation, even if accompanied by home detention, also sends a strong message to potential white-collar offenders. *See United States v. Tomko*, 562 F.3d 558, 573 (3d Cir. 2009) (declining to adopt government's argument that district court's probation-only sentence in complex securities fraud case, which the government described as a "100% variance," would harm general deterrence); *See also Gabbay, supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.")[15] "[E]mpirical

---

[15] *See generally* Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?* 100 J. Crim. L. & Criminology, 765, 817 (2010) (summarizing empirical studies of deterrence and concluding there is no apparent deterrent effect from more severe punishments, a modest deterrent effect for the perceived certainty of legal punishment, and "an even stronger effect for the certainty of non-legal or informal sanctions"); Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less is More When it Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1203 (2014) ("[S]tudies repeatedly show that awareness of

research shows no relationship between sentence length and deterrence."[16] As for

whether there is any "particular quantum of punishment that results in increased

deterrence and thus decreased crime":

> … Here the findings are uniformly negative: there is no evidence that
> increases in sentence length reduce crime through deterrence. Current
> empirical research on general deterrence shows that while certainty of
> punishment has a deterrent effect, "increases in severity of punishments
> do not yield significant (if any) marginal deterrent effects …[17]

Furthermore, "general deterrence" alone cannot support the weight of a sentence

sending an individual to prison. *See United States v. Corsey*, 723 F.3d 366, 381 (2d

Cir. 2013) (Underhill, J., concurring) (where the district court's § 3553 analysis

relied "almost exclusively on one word – deterrence," that factor simply could not

"bear the weight assigned it in the totality circumstances of in the case," (quoting

*United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008)). Several courts have

recognized the over-emphasis on "general deterrence" as a basis for imposing prison

sentences. For example, in *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010),

---

potentially severe sanctions does not produce less crime."); Robert Weisberg, *Reality-Challenged Philosophies of Punishment*, 95 Marq. L. Rev. 1203, 1248 (2012) (summarizing empirical research on general deterrence which concludes that "although the general deterrent effect may operate at some base rate to reduce crime, changes in penal policy or enforcement play little role in sending a message that crime does not pay").

[16] Amy Baron-Evans, *Sentencing by the Statute*, at 7 (Apr. 27, 2009).

[17] *Id.* quoting Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: *A Review of Research*, at 28-29 (2006) (emphasis in original).

the defendant, who was convicted of bankruptcy fraud and bank fraud, was sentenced to a five-year period of probation with house arrest in lieu of the recommended Guideline sentence of 27-33 months. During sentencing, the District Court first noted that the defendant was unlikely to re-offend because of his post-offense rehabilitation. Then, the Court explained that "general deterrence" was not a significant factor in the case. *Id*. at 1011. The District Court reasoned that the conditions of probation and restitution constituted sufficient "specific deterrence" to prevent Edwards from engaging in similar conduct. *Id*. In upholding the District Court's sentence, the Ninth Circuit held that § 3553(a) "does not require the goal of general deterrence be met through a period of incarceration." *Id*. at 1016; *See also United States v. H. Ty Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015) (finding the message sent by probationary sentence in tax evasion case with advisory Guidelines of 46-57 months sufficient to satisfy general deterrence under § 3553(a)).

**e. Specific Deterrence - 18 U.S.C. § 3553(a)(2)(C): the need for the sentence imposed to protect the public from further crimes of the defendant.**

The circumstances of Mr. Zhong's offense are unique and unlikely of repetition. It would be virtually impossible for Jimmy to ever find himself in a remotely similar situation again. Further, a sentence of home confinement, probation and community service sends a clear message to Jimmy not to repeat his conduct— message that Jimmy has already received loud and clear. This process has been a life

changing experience for Jimmy. His unequivocal acknowledgment of his wrongdoing and his very real remorse, reflected by his pre-arrest cooperation with law enforcement, demonstrates that specific deterrence through incarceration is unnecessary.

Jimmy's short-lived criminal conduct occurred over a decade ago and since that time he has led a law-abiding life. Since his arrest, Jimmy has worked as a Lyft and Uber driver, and has started and developed a metal cutting business with multiple clients that has grown and is showing promise. He has proven he will live a law-abiding life. A prison sentence will shut this business down and require Jimmy to start anew.

Jimmy is extremely unlikely to recidivate. Society does not need to be protected from him through incarceration. And incarceration is not the key to deterrence. Courts have recognized the serious impact even non-custodial sentences have on a defendant. As explained by the Supreme Court in *Gall, supra, when the Court upheld* a sentence of 36 months' probation for a defendant where the bottom of the Guidelines was 30 months incarceration:

> … We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit

unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer.

…

*Id.* at 48-50 (citations omitted). *See also United States v. Springer*, 684 F. App'x 37, 40 (2d Cir. 2017) (referring to Supervised Release as "conditional liberty").

Courts have recognized that society can in fact benefit from sentencing individuals to shorter or non- custodial sentences that would allow them to use their skills to better serve the community. *United States v. Coughlin*, No. 06-CR-20005, 2008 WL 313099, at *7 (W.D. Ark. Feb. 1, 2008) (sentencing a Walmart executive who pled guilty to aiding and abetting wire fraud and filing false tax returns, yielding a guideline range of 27 to 33 months of imprisonment, to five years' probation, including 27 months of home detention and 1,500 hours of community service in part because defendant's "expertise is better put to use than wasted in the physical deterioration of unnecessary imprisonment"); *United States v. Warner*, 792 F.3d 847, 854 (7th Cir. 2015) (despite a Guidelines range of 46 to 57 months, the court affirmed a sentence of a defendant to two years' probation; district court found that due to defendant's extensive philanthropy, "'society will be best served by allowing [defendant] to continue his good works' outside of prison"); *United States v. Smith*, No. 1:06-CR-00394, 2009 WL 249714, at *4 (N.D. Ohio Feb. 2, 2009)

(finding community service would put defendant's abilities as an accountant and lawyer to "good use," and commented that those "abilities [] would otherwise be wasted during a more lengthy prison term"); *United States v. Collado*, No. 07-CR-1144, 2008 WL 2329275, at \*5 (S.D.N.Y. June 5, 2008) (noting "community would be better served by having [defendant] in it and available to provide substance abuse treatment to others").

Sentencing Mr. Zhong to probation and community service, even if combined with a period of home detention, if necessary, meets the goal of both deterrence and punishment within the ambit of the parsimony clause.

**f.  18 U.S.C. § 3553(a)(3): the kinds of sentences available.**

The Court has broad discretion in imposing sentence on Mr. Zhong. There is no mandatory minimum and a statutory maximum of 20 years. The advisory Guidelines as determined by Probation and the plea agreement is 27-33 months. Probation may be imposed for a term of not less than 1 nor more than 5 years. A term of supervised release of not more than 3 years. There is a mandatory special assessment of $100. The Guidelines advise a fine between $10,000 to $100,000 with a maximum of $250,000.00.

The Court may consider the expected cost of a particular sentence. According to the Administrative Office of the United States Courts, the annual cost of imprisonment at a Bureau of Prisons facility is $44,258, while supervision by a

Probation Officer is only $4,454. (PSR ¶ 132).  It is therefore more almost **ten times** more expensive to incarcerate someone than supervise them on probation. *See, e.g., United States v. Graham*, 915 F.3d 456, 460 (7th Cir. 2019) (court's consideration of incarceration costs, although not explicitly mentioned in 18 U.S.C. § 3553(a), appropriately played into its analysis of the cost benefit to society, and the benefit to the inmate when determining sentence); *United States v. Scholar*, 252 F.Supp.3d 711 (WI E.D. 2017) (finding a lengthy period of home confinement would be as efficient, and less costly, than imprisonment as a form of punishment for defendant with serious health conditions).

Moreover, the First Step Act of 2018, P.L. No. 115-391 ("the Act") reflects a bipartisan Congressional effort to impose substantial changes to the tough-on-crime prison and sentencing laws of the 1980's and 1990's that led to an explosion in federal prison populations and costs. *See United States v. Simons,* 375 F.Supp.3d 379 (E.D.N.Y. 2019). Among other things, the Court in that case cited a House Judiciary Committee report relied upon by Congress in voting overwhelmingly to pass the Act which found:

> … [the Bureau of Prisons] has a growing prison population that, because of its rising costs, is becoming a real and immediate threat to public safety. … If the current spending trajectory continues and we do not reduce the prison population and prison spending, there will continue to be fewer and fewer prosecutors to bring charges, fewer agents to investigate federal crimes, less support to state and local

> criminal justice partners, less programs, and cuts along a range of other criminal justice priorities . . .

H.R. Rep. No. 115-699, at 23-24 (2018) (internal citations omitted). Another source cited in *Simons, supra*. Is Ames Grawert *et al*., *Ending Mass Incarceration: A Presidential Agenda*, Brennan Center for Justice 1, 2 (2019); H.R. Rep. No 115-699, at 22 (2018) (explaining that Congress saw a need to reform the federal prison system "through the implementation of corrections policy reforms designed to enhance public safety by improving the effectiveness and efficiency of the federal prison system in order to control corrections spending, manage the prison population, and reduce recidivism.")

**g.  18 U.S.C. § 3553(a)(4): the sentencing range established by the guidelines.**

As many courts and other commentators have observed, the Guidelines in general, and the fraud loss calculations in particular, lead to draconian recommended ranges for fraud offenses.  Instead of accurately positioning a defendant's conduct along the sale of culpability as the Guidelines are meant to, these sentences allow inflated loss figures to dominate the Guidelines analysis to the exclusion of other factors both within the Guidelines and under Section 3553(a).  Judge Rakoff of the Southern District of New York has observed that the Guidelines have often "so run amok that they are patently absurd on their face" due to the "kind of 'piling-on' of points for which the guidelines have frequently ben criticized." *United States v.*

*Adelson, supra,* 441 F.Supp. 2d 506, 510, 515 (S.D.N.Y. 2006), *affirmed,* 301 F.

App'x 93 (2d Cir. 2008).  Commentators have expressed similar criticisms. *See, e.g.,*

Barry Boss and Kara Kapp, *How the Economic Loss Guideline Level Lost Its Way,*

*and How to Save It,* 18 OHIO St. J. CRIM. L. 605, 617-20 (2021) (highlighting that

the "loss tables are insensitive to motive."); *United States v. Musgrave,* 647 Fed.

Appx 529, 538 (6th Cir. 2016) ("But there is reason to believe that, because the loss

Guidelines were <u>not</u> developed using an empirical approach based on date about past

sentencing practices, it is particularly appropriate for variances.)

     For these reasons, the "loss" number overstates the seriousness of Jimmy's

misconduct.     Nor is there any actual loss to any innocent victim – but rather a

monumental gain to the government.

**h. 18 U.S.C. § 3553(a)(6): the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

     A civil forfeiture complaint filed in the Northern District of California (USA

V. 69370 BITCOIN, NDCA, 20-CV-07811,)[18] alleged that in 2012, a person

identified as Individual X, hacked into Silk Road and gained unauthorized and illegal

access to and stole over 70,000 Bitcoin (40% more than taken by Jimmy Zhong)

valued then at about $359,000 belonging to Silk Road.  According to the Complaint,

---

[18] Attached as Exhibit F.

Ross Ulbricht learned of Individual X's online identity and threatened Individual X for return of the cryptocurrency to Ulbricht. Individual X did not return the cryptocurrency but kept it and did not spend it. The Complaint further alleges that on November 3, 2020, Individual X signed a Consent and Agreement to Forfeiture with the U.S. Attorney's Office, Northern District of California in which he consented to the forfeiture of the Bitcoin to the United States government valued in excess of $4 billion. Individual X was never prosecuted. Indeed, defense counsel is unaware of any case in which a person was prosecuted after he stole Bitcoin from Silk Road and returned the Bitcoin. Unfortunately, that is not the situation here. In any event, we urge that given the unique facts here, a non-custodial sentence would be consistent with sentences imposed in other white collar fraud cases in this and other districts.

Indeed, substantial variances have been afforded in cases with far worse conduct. See for example, *United States v. Stephen Jemal,* 15 Cr. 570 (JRP) (EDPA June 20, 2019) ($8 million bank fraud. Court granted variance from 78 months to 18 months incarceration); *United States v. Jason Nissen,* 17-cr-477 (PAE) (S.D.N.Y.) (Sept. 2019) (defendant convicted of $71 million Ponzi scheme. Variance from 97 months to 27 months granted based in part on defendant's charitable endeavors and family circumstances); *United States v. Lumiere*, 16-cr-483 (S.D.N.Y.) (former portfolio manager at Visium Asset Management convicted after trial of securities

and wire fraud involving between $9.5 and $25 million loss to investors and millions of dollars in unlawful gain to defendant. Despite defendant's "highly significant" role in the scheme and his attempt at blackmail to conceal his crimes, variance granted from 87-108 to 18 months' imprisonment); *United States v. Block*, No. 16-cr-595 (S.D.N.Y. 2017) (former CFO of a publicly traded real estate investment trust masterminded fraud to manipulate the company's financial results resulting in $300 million shareholder loss. Defendant also "brazenly" falsified key accounting numbers. Noting, among other things, the defendant's clean criminal record before the offense and his "personal history" as a good father and friend, court imposed variance from 84 years to 18 months. See *Brian Block sentenced to 18 Months In Prison*, Investment News (Nov. 8, 2017), http://www.investmentnews.com/article/20171108/FREE/171109929/brian-block-sentenced-to-18-months-in-prison); *United States v. Corvine*, No. 15-cr-00171 (S.D.N.Y.) (conviction after a three-week trial for role in a complex scheme to profit from the manipulation of the price of securities while clients lost entire investment. Cervino also lied to the SEC during its investigation. Dkt. 362 at 3-7. Court sentenced defendant to one year and a day with a variance from 135-168 months, Judgment, No. 15-cr-00171, Dkt. 367 at 3.); *United States v. Litvak*, No. 13-cr-19 (D. Conn. 2018), after trial Guidelines sentence of 108 months' imprisonment rejected and sentence of two years imposed for sophisticated fraudulent conduct

affecting many victims, and causing millions of dollars in loss, in over 55 securities transactions over three years. Sentencing Tr., July 25, 2014, Dkt. 273 at 61:13-17, 158:15-19); *United States v. Graham*, No. 06-cr-137 (D. Conn.), the defendant, an in-house attorney, convicted of conspiracy and fraud charges in a fraudulent reinsurance transaction. Court found fraud caused a loss of over $500 million and defendant affirmatively concealed the fraudulent nature of the transaction. Order of Oct 31, 2008, No. 06-cr-137, Dkt. 1164 at 15. Variance from sentence of life imprisonment and imposed a sentence of one year and one day, along with two years of supervised release. Judgment, No. 06-cr-137, Dkt. 1269 at 1); *United States v. Caspersen*, 16-cr-414 (JSR)(S.D.N.Y.), defendant defrauded friends and college classmates out of $36,000,000 in Ponzi scheme, using their money to make payments on a house and an apartment. Court imposed a variance from the defendant's Guideline range of 151-188 to 48 months in prison.); *United States v. Newkirk*, 16-cr-1241 (JSR) (S.D.N.Y. Apr. 21, 2016), a securities fraud defendant convicted at trial was sentenced to a term of imprisonment of 6 months notwithstanding a Guidelines range of 135 to 168 months.) Three other defendants sentenced recently in the S.D.N.Y. with Guidelines ranges of 70-97 months, were sentenced, respectively, to terms of imprisonment of 24 months (*United States v. Hochfeld*, 13-cr-00021 (PAC)(S.D.N.Y. 2013); 24 months (*United States v. Gray*, 15-cr-00297 (SHS) (S.D.N.Y. Oct. 25, 2016); and 30 months (*United States v.*

*Hampton*, 13-cr-301 (RWS) (S.D.N.Y. 2013).

Given these facts, and particularly the civil resolution in the matter in the Northern District of California referenced above, it would be in the interests of justice to avoid sentencing disparity by imposing a sentence of probation on Jimmy Zhong, allowing him to continue on the path he is on rebuilding his life as an honest and productive member of society.

**i. 18 U.S.C. § 3553(a)(7): the need to provide restitution to any victims of the offense.**

As detailed above, Silk Road and/or Ross Ulbricht never had a right to lawfully possess the Bitcoin that Jimmy took, and do not have a right to restitution.

**III. CONCLUSION - A SENTENCE OF FIVE YEARS OF PROBATION, COMBINED WITH A PERIOD OF HOME DETENTION, IF NECESSARY, IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO MEET THE GOALS OF SENTENCING.**

The history and characteristics of Jimmy Zhong, including his dysfunctional family life devoid of love and affection, autism, stunted emotional growth, social isolation, being bullied as a child, and his young age of 22 when he committed the crime help to put his actions into perspective when fashioning a reasonable sentence.

Further, the nature and circumstances of the offense contain mitigating factors not seen in many other financial crime cases.

- The unplanned nature of the crime, combined with the utter simplicity of the criminal act.

- Jimmy stopped the withdrawals on his own even though he could have continued to acquire additional Bitcoin undetected.

- Silk Road and/or Ross Ulbricht had no right to possess the Bitcoin that Jimmy took. They are not victims that need justice or that need restitution to be made whole financially.

- The tacit after the fact approval by Ross Ulbricht of Jimmy's withdrawal of the Bitcoin from Silk Road.

- The staggering financial benefit to the Government from,

  - Jimmy's taking the Bitcoin from Silk Road back in 2012, preventing Ulbricht from dissipating it;

  - Jimmy's preservation of the overwhelming majority (~96%) of the Bitcoin for almost a decade;

  - The dramatic increase in value of Bitcoin since 2012;

  - Jimmy's foresight back in 2017 to convert the Bitcoin Cash to Bitcoin;

  - Jimmy's cooperation with the Government, with no promise of anything in return, giving the Government the ability to control billions

in dollars' worth of Bitcoin that the Government would not have been able to control without Jimmy's cooperation; and

A variance is appropriate considering the Section 3553(a) factors and the mandate of the parsimony provision.  A felony conviction (and the life challenges it brings) coupled with a sentence of home detention, and probation amount to serious punishment.[19]  Such a sentence, when coupled with mental health treatment and community service accounts for what Jimmy did, who Jimmy is, and how he responded when his wrongdoing was brought to light.

March 24, 2023

Respectfully submitted,
**BACHNER & ASSOCIATES, P.C.**

By: **_/s/ Michael F. Bachner_**
Michael Bachner, Esq.
111 Broadway, Suite 701
New York, NY 10006
O:  (212) 344-7778
F:  (212) 344-7774
Email: mb@bhlawfirm.com

**GARLAND, SAMUEL & LOEB, P.C.**

By: **_/s/ Donald F. Samuel_**
Donald F. Samuel
Email: dfs@gsllaw.com

---

[19] We submit that a fine is unwarranted given Mr. Zhong' financial situation after forfeiture and his looming tax debts from the Bitcoin liquidated to satisfy the forfeiture. *United States v. Elfgeeh*, 515 F.3d 100, 136 (2d Cir. 2008).

By: **/s/ John A. Garland**
John A. Garland
Email: jag@gsllaw.com

By: **/s/ Amanda Clark Palmer**
Amanda Clark Palmer
Email: aclark@gsllaw.com

Garland, Samuel & Loeb, P.C.
3151 Maple Drive
Atlanta, GA 30305
Work: (404) 262-2225

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of February 2023, I electronically filed

**SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF JAMES**

**ZHONG** with the Clerk of Court using the CM/ECF system which will

automatically send email notification of such filing to all attorneys and parties of

record.

By: **/s/ John A. Garland**
Garland, Samuel & Loeb, P.C.
3151 Maple Drive
Atlanta, GA 30305
Work: (404) 262-2225
Email: jag@gsllaw.com
