N4e2ZhoS kjc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,                New York, N.Y.

4           v.                              22 Cr. 606 (PGG)

5  JAMES ZHONG,

6              Defendant.

7  ------------------------------x          Sentencing

8                                           April 14, 2023
                                            3:00 p.m.
9

10 Before:

11                 HON. PAUL G. GARDEPHE,

12                                          District Judge

13

14                      APPEARANCES

15
   DAMIAN WILLIAMS
16      United States Attorney for the
        Southern District of New York
17 BY:  DAVID FELTON
        Assistant United States Attorney
18

19 BACHNER & ASSOCIATES, P.C.
        Attorneys for Defendant
20 BY:  MICHAEL F. BACHNER

21

22 GARLAND SAMUEL & LOEB, P.C.
        Attorneys for Defendant
23 BY:  JOHN A. GARLAND

24

25

N4e2ZhoS kjc

1          (Case called)

2          THE DEPUTY CLERK:  Counsel for the government, please

3    state your appearance.

4          MR. FELTON:  Good afternoon, your Honor.  David

5    Felton for the government, joined by IRS Special Agents Trevor

6    McAleenan and Michael Lane.

7          THE DEPUTY CLERK:  Counsel for defendant, please state

8    your appearances.

9          MR. BACHNER:  Good afternoon, your Honor.  Michael

10   Bachner, of Bachner & Associates, P.C., on behalf of Mr. Zhong.

11         MR. GARLAND:  Good afternoon, your Honor.  John

12   Garland, Atlanta, Georgia, from the law firm of Garland,

13   Samuel & Loeb, for Mr. Zhong.

14         THE COURT:  This matter is on my calendar for

15   purposes of sentencing.

16         In preparation for sentencing I have read the

17   presentence report dated January 31, 2023.  I have read the

18   defendant's sentencing brief.  I have read a psychiatric

19   report.  I have read a collection of letters from friends all

20   docketed on March 24, 2023; another letter of support

21   submitted on March 26, 2023; and another collection of letters

22   all docketed on April 3, 2023.  I have also read the

23   government's submission dated March 31, 2023.

24         Mr. Bachner, have you read the presentence report,

25   its recommendation, and discussed it with Mr. Zhong?

N4e2ZhoS kjc

1          MR. BACHNER:  Yes, your Honor, I have.

2          THE COURT:  And Mr. Zhong, have you read the

3   presentence report, its recommendation, and discussed it with

4   your attorneys?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Mr. Bachner, do you have any objections to

7   the factual portions of the presentence report?

8          MR. BACHNER:  No, your Honor.

9          THE COURT:  Does the government have any objections

10   to the factual portions of the presentence report?

11          MR. FELTON:  No, your Honor.

12          THE COURT:  I hereby adopt the findings of fact set

13   forth in the presentence report.

14          Although I am not required to impose sentence in

15   accordance with the sentencing guidelines, I am required to

16   consider what the guidelines recommend.

17          Here, Mr. Zhong pled guilty to wire fraud, so the

18   fraud guidelines thus apply.  Because Mr. Zhong pled guilty to

19   a violation that has a statutory maximum sentence of 20 years'

20   imprisonment, the base offense level is seven.  Because the

21   loss resulting from the offense exceeded $550,000 but is less

22   than $1.5 million, Mr. Zhong's offense level is increased by

23   14 levels.  Mr. Zhong's offense level is reduced by three

24   levels for his acceptance of responsibility.

25          After application of all of the adjustments I have

N4e2ZhoS kjc

1    noted, his total offense level is 18.

2           As to criminal history, the defendant has a 2014

3    conviction for driving under the influence which results in

4    one criminal history point.  He thus falls within criminal

5    history category I.

6           Offense level 18 at criminal history category I

7    results in a guidelines range of 27 to 33 months'

8    imprisonment.

9           Mr. Bachner, do you have any objections to the

10   accuracy of the guidelines calculations as I have reported

11   them?

12          MR. BACHNER:  I do not, your Honor.

13          THE COURT:  Does the government have any objection to

14   the accuracy of the guidelines calculations as I have reported

15   them.

16          MR. FELTON:  No, your Honor.

17          THE COURT:  Based upon my independent evaluation of

18   the sentencing guidelines, I find that the offense level is 18,

19   criminal history category is I, and the recommended sentencing

20   range is 27 to 33 months' imprisonment.

21          I will hear from you, Mr. Bachner, as to an

22   appropriate sentence.

23          MR. BACHNER:  Thank you, your Honor.

24          Your Honor, we have done a little bit of division of

25   labor here.  Mr. Garland is going to address the issues

N4e2ZhoS kjc

1    related to the facts of the -- underlying facts of the case,

2    and I'm going to address the 3553(a) categories, with your

3    Honor's permission.

4              THE COURT:  All right.  That's fine.

5              Mr. Garland.

6              MR. GARLAND:  And does your Honor have any preference

7    as to whether we sit here or stand at the podium?

8              THE COURT:  Wherever you are most comfortable.

9              MR. GARLAND:  Thank you, your Honor.

10             In this case, there are very few areas of

11   disagreement between us and the government.  These

12   disagreements are really only about characterization of the

13   facts and how those facts should impact a reasonable sentence

14   in this case, but not so much as to the facts themselves.

15   Those disagreements are limited.

16             I want to first focus on areas where there is

17   agreement with the government.

18             In September of 2012, at the age of 22, Jimmy Zhong

19   accidentally found, and intentionally exploited, a simple flaw

20   in the illegal Silk Road website.  Jimmy stumbled onto that

21   flaw while withdrawing Bitcoin from the website.  He

22   accidentally double clicked the withdrawal button and was

23   surprised to discover that it resulted in withdrawing double

24   the amount of Bitcoin.

25             Without extensive planning or effort, but over

N4e2ZhoS kjc

1    several hours of work spread out over a few days, he created

2    multiple user accounts, deposited Bitcoin, and then rapidly

3    clicked withdrawal.  By doing so, Jimmy obtained 50,000

4    Bitcoin valued at the time of around $620,000.

5         And to assess what Jimmy took back in 2012, it is

6    important to recognize what Bitcoin was at the time.  It --

7    while it is a bridge too far to say it was like monopoly money

8    at the time, such a characterization doesn't miss the mark by

9    much.  Jimmy and others around the world were creating Bitcoin

10   seemingly from thin air, mining them—*i.e.*, creating them—with

11   nothing more than home computing equipment.  At the time, it

12   didn't take the powerful server farms that it takes now to

13   mine and create Bitcoin.  In 2012 Bitcoin was a little known,

14   little understood, uncertain, and speculative cryptocurrency.

15   Jimmy did not nor would anyone at the time have viewed Bitcoin

16   as comparable to U.S. currency.

17        Of course what Jimmy did was wrong, your Honor.

18   Jimmy recognized that he was taking something that at that

19   moment had significant value, and he recognizes he must be

20   punished for that, along with his other acts.  He had no right

21   to take the Bitcoin from Silk Road and Ross Ulbricht; however,

22   it is equally true that Ulbricht only had possession of that

23   Bitcoin through ill-gotten means and had no right to possess

24   the Bitcoin in the first place.  Silk Road and Ross Ulbricht

25   are not victims in the true sense of the words and did not

N4e2ZhoS kjc

1   truly suffer harm as a result of Jimmy's actions.

2          Jimmy, while concealing his control of the Bitcoin,

3   held onto most of that Bitcoin for almost a decade, around 96

4   percent, around 51,352 of the total 53,500 Silk Road Bitcoin.

5   He did not use any of it until 2017.  And between 2017 and the

6   time of the seizure, Jimmy spent approximately or used or

7   dissipated approximately 4 percent of that Bitcoin on himself,

8   friends, and gifts, and some of it was in fact stolen from his

9   home.

10         Jimmy knows that holding onto and spending some of

11  that Bitcoin was wrong.  It's part of what he must be punished

12  for.  And he understands that the Bitcoin he dissipated, while

13  a small part of the overall amount of Bitcoin that the

14  government now has in its possession, was still significant,

15  worth around $16 million at the time he dissipated it.

16  However, 96 percent of the Silk Road Bitcoin, along with other

17  Bitcoin, is under the government's control.  The value of the

18  Bitcoin handed over to the government is staggering, worth

19  between 3.4 billion at the time of the seizure and 1.5 billion

20  as we sit here today in this courtroom, your Honor.

21         Much of the dissipated Bitcoin was converted into

22  assets that the government has under its control currently.

23  Of those $16 million, Jimmy invested around 9.5 million in his

24  80 percent interest in RE&D Investments, a Memphis based

25  company with substantial real estate holdings in the millions

N4e2ZhoS kjc

1    of dollars.  The government also recovered over $600,000 in

2    cash and precious metals from Mr. Zhong's home.

3          The government seized the device that contained the

4    majority of the Bitcoin in this case, and once they did that,

5    Jimmy could no longer control that Bitcoin.  However, neither

6    could the government.  The government had no way to use that

7    device to control the Bitcoin without Mr. Zhong's cooperation.

8    Jimmy gave the government, with no promise of anything in

9    return, the keys and tools it needed to take control of

10   billions of dollars worth of Bitcoin——control the government

11   would not have been able to obtain without Jimmy's

12   cooperation.

13         As Jimmy has gone through the multistep process of

14   giving the government control of the Bitcoin, he has repeatedly

15   proven, through his actions, his good-faith desire to aid and

16   cooperate with the government.  Jimmy decrypted the files

17   needed to access the Bitcoin, provided the government with the

18   private keys to the Bitcoin on the blockchain, provided copies

19   of Bitcoin wallets and the passwords to access those wallets.

20   He spent days and days over the course of weeks extracting

21   Bitcoin from lightening nodes.  He identified Bitcoin in

22   interest bearing accounts online and he sent it to the

23   government and even gave the government control of around 14

24   Bitcoin unconnected to Silk Road worth around $420,000 at

25   today's price of $30,000 a Bitcoin.

N4e2ZhoS kjc

1          Jimmy knew then, and he knows now, that he committed

2     a crime when he took the Bitcoin, that he should not have kept

3     the Bitcoin all those years, and he should not have spent any

4     of it.  He is remorseful what he did and understands he must

5     be punished.

6          And that's what we view as the heart of this case,

7     your Honor.  And having covered that, I want to turn to some

8     of the areas where there is some agreement between us and the

9     government.  And while I may spill many words and use a lot of

10    time to cover these disagreements, I do so only because some

11    of the issues are nuanced and hard to explain, and I ask that

12    your Honor keep in mind that the time I spend on them is not

13    commensurate with their importance in the case.

14         First, the defense and the government both agree that

15    Jimmy stopped the withdrawals at 50,000 Bitcoins, but there is

16    potentially slight disagreement as to why.  The 50,000 Bitcoin

17    limit mentioned by Jimmy in his posts online and noted by the

18    government in their memo was simply a daily volume.  Jimmy

19    could have continued the withdrawal for more days, even weeks,

20    until it was detected.  Jimmy chose not to.  This does not

21    excuse his behavior, but helps to put it into context.

22         Another point of disagreement is whether Jimmy and

23    Ulbricht, who ran the Silk Road, messaged each other after

24    Jimmy took the Bitcoins.  After Jimmy took the Bitcoins from

25    Silk Road, Ross Ulbricht contacted him over the Silk Road

N4e2ZhoS kjc

1    messaging service and asked him to explain how he obtained the

2    Bitcoin.  After Jimmy told him what he did, Ulbricht did not

3    ask Jimmy to return the coins.  Rather, he thanked Jimmy for

4    his candor and sent him unsolicited additional Bitcoin.

5           The government notes that they were not able to find

6    these chats.  However, the fact that the government could not

7    find them does not mean they didn't occur.  Jimmy has been

8    clear from the first day we met him, your Honor, that these

9    chats occurred.  He told us this, knowing the government had

10   the servers.  He told us this fully expecting the government

11   to be able to corroborate the existence of these chats.  The

12   government even acknowledged in their memo that there was a

13   message from an account Jimmy controlled that they could not

14   read.  The government also does not know if those chats were

15   deleted or lost from the Silk Road servers between the time

16   they occurred in 2012 and the later point when the government

17   seized those servers.  They had no control, visibility, or

18   ability to know what happened with the data in that time.  And

19   further, the defense doesn't have access to those servers and

20   can't search them.

21          The defense also disagrees with the government's

22   characterization of Jimmy's efforts to conceal and control the

23   Silk Road Bitcoin.  The government stated in their memo that

24   Jimmy used considerable technical skills to conceal and

25   benefit from this crime over nine years.  However, the steps

N4e2ZhoS kjc

1    that Jimmy took to conceal his control over the Bitcoin were

2    neither particularly complex nor did they require considerable

3    technical skills.  Jimmy created multiple user names on the

4    Silk Road to withdraw the Bitcoin.  Like every other user of

5    the Silk Road, he did not use his true name for those user

6    names.  He later sent a percentage of the original Bitcoin

7    through a Bitcoin mixer, an online program set up and

8    available with no input from Jimmy whatsoever that made those

9    750 Bitcoin he sent through it harder to trace back to Jimmy.

10          Jimmy also converted the Bitcoin Cash he received in

11   the 2017 Bitcoin Cash hard fork into Bitcoin, making that

12   Bitcoin generated in the conversion harder to trace back to

13   Jimmy.  And while that conversion had the effect of

14   concealment, concealment was not the goal of the conversion.

15   Jimmy did it because he felt Bitcoin would be more valuable in

16   the long run than Bitcoin Cash.

17          Jimmy was right.  That decision resulted in the

18   government recovering more value——in fact, tens of millions of

19   dollars more in value——than the government would have had

20   Jimmy not converted the Bitcoin Cash to Bitcoin.

21          It's also true that the inherent semi-anonymity of

22   Bitcoin helped to conceal Jimmy's control of the Bitcoin.  Yet

23   that feature is built into Bitcoin, not one that Jimmy

24   created.  The overwhelming majority of the Bitcoin sat on the

25   Bitcoin blockchain such that anyone could have traced it back

N4e2ZhoS kjc

1    to Silk Road with any of the many publicly available Web-based

2    blockchain explorers.

3              It is also important to note that Jimmy always

4    reported all Bitcoin sales, whether connected or unconnected

5    to the Silk Road, on his tax returns.

6              The government also accurately notes that Jimmy

7    waited around four months from the date of the search to turn

8    over control of the Bitcoin to the government.  However, the

9    delay was not brought on by an unwillingness to cooperate as

10   the government suggests, but instead by multiple other

11   reasons.

12             Defense counsel needed time to do our job.  We  needed

13   to be able to give our client informed advice, and we needed

14   time to do that.  The defense needed to hire its own forensic

15   expert to trace the Silk Road Bitcoin and separate it from

16   Bitcoin that Jimmy legitimately obtained from other sources.

17   No easy task.  Defense counsel needed to research, given the

18   civil resolution of a similar case, whether a crime had even

19   been committed.

20             Further, not long after the search warrant was

21   executed at his home, Jimmy directed us to reach out to the

22   government to begin negotiating a resolution of this case.

23   However, the government, like the defense, also needed time to

24   get up to speed.

25             Once the government was ready to meet, the defense

N4e2ZhoS kjc

presented several strong legal and factual arguments to
mitigate Jimmy's culpability.  Only a few days later, before
any decision was rendered by the government, Jimmy gave the
government control over the Silk Road-related Bitcoin as well
as other Bitcoin unrelated to Silk Road.

          Another area of disagreement is the role the dramatic
financial benefit to the government should play in determining
an appropriate sentence.  Again, the difference here is really
only one of emphasis, not of the facts.

          In 2012, when Jimmy took the Bitcoin from Silk Road,
it had a value of around $620,000 at that moment, a small
fraction of the value of the Bitcoin the government seized and
currently possesses.  As I have said, on the day of the
seizure, the Bitcoin was worth around 3.39 billion, almost 5.5
thousand times more than when Jimmy took it from Silk Road in
2012.  Today the Bitcoin is worth about 1.5 billion, over 2.5
thousand times more valuable than on the date Jimmy took it
from Silk Road.

          There is no question that but for the government's
hard work and its investigation, there would be no financial
benefit to the government here.  It is not solely attributable
to Jimmy's acts of taking and retaining the Bitcoin.

          It  wasn't until agents showed up at Jimmy's house to
search it that Jimmy was forced to really confront what he had
done.  And the government also accurately notes that it would

N4e2ZhoS kjc

1   have -- that the financial benefit to the government would

2   have been larger had Jimmy not dissipated around $16 million

3   worth of Bitcoin.  It is undisputed that Jimmy substantially

4   benefited from his ill-gotten gains.  However, we don't agree

5   that benefit is appropriately viewed as a loss to the

6   government.  There would have been no benefit or one that was

7   substantially smaller had Jimmy not taken the Bitcoin from

8   Silk Road back in 2012.  For instance, had Ulbricht dissipated

9   all 50,000 Bitcoin before the government seized the Silk Road

10  Bitcoin, the government would have received nothing from that

11  Bitcoin.  And even assuming Ulbricht hadn't dissipated it, the

12  government would have sold that 50,000 Bitcoin at auction in

13  2014 for around 16.7 million.  Instead of 16.7 million, the

14  government now has control over exponentially more value,

15  ranging from over 200 times more value based on the 3.39 value

16  at the time of the seizure or 92 times more value based on the

17  value of 1.5 billion today, an almost unfathomable increase in

18  value to the government.

19          Undoubtedly Jimmy derived a large financial benefit

20  from his wrongdoing.  Undoubtedly he should be punished for

21  that.  Yet it should not be ignored that Jimmy preserved and

22  grew the majority of what he obtained from Silk Road and the

23  U.S. government has obtained an enormous final benefit from

24  the return of that Bitcoin.

25          The government's right; we are asking the Court to

N4e2ZhoS kjc

1    take that financial benefit into consideration when fashioning

2    an appropriate sentence.  However, it should also be

3    recognized that dramatic increase in value is not just a

4    benefit to Jimmy.  Imagine, if you will, after 2012 if Bitcoin

5    had gone down to zero in the ensuing years.  It is hard for me

6    to believe that we would be sitting here today if that had

7    happened.  In this sense, this prosecution is in part because

8    of the dramatic rise in the value of Bitcoin.  In this context

9    that we sit here in part because Bitcoin went up, it's

10   appropriate for the Court to take into consideration the

11   enormous financial benefit to the government brought in part

12   by Jimmy's acts of taking and retaining the Silk Road Bitcoin.

13           The defense and the government also disagree as to

14   the emphasis that should be placed on the harm caused to the

15   victim in this case.  While there is no disagreement that the

16   harm is to Ulbricht, who only obtained control of the Bitcoin

17   by his criminal scheme for which he is serving two life

18   sentences plus 40 years, and we believe that the government

19   agrees with us that Ulbricht never had a right to possess that

20   Bitcoin, is not a victim in the traditional sense of the word.

21   While at one point in their memo the government laments that

22   it's become too easy for advanced computer savvy individuals

23   like Zhong to target and victimize holders of cryptocurrency

24   from behind computer screens, I can't really believe that the

25   government truly views Ulbricht as someone who has been

N4e2ZhoS kjc

1    victimized by Jimmy.

2            The only disagreement between us and the government
3    on this issue comes to our respective views on how the harm
4    impacts the appropriate sentence.  The seriousness of Jimmy's
5    crime or any crime is deeply intertwined with the nature of
6    the harm that was caused.  We raise this not to suggest that
7    it's okay to steal from criminals.  It most certainly is not.
8    Jimmy deserves to be punished.  However, it is also true that
9    the nature of the harm caused by Jimmy's crime must be taken
10   into consideration.

11           Here the harm that must be punished is of a
12   fundamentally different character than cases involving
13   innocent victims.  No innocent investor was misled.  No
14   innocent individual lost the fruits of his or her hard labor.
15   No retiree lost their nest egg.  No family lost their ability
16   to pay their home mortgage.  No parents lost their ability to
17   send their kids to school.  Ulbricht's loss of his ill-gotten
18   gains to Bitcoin that he had no right to possess is just a
19   fundamentally different animal.

20           Still, Jimmy understands and fully appreciates what
21   he did was wrong.  He has abandoned his naive belief that he
22   held so long that what he did was no big deal because of who
23   he took it from or what he took.  He had no right to the
24   Bitcoin and will never again engage in any illegal conduct.

25           Thank you, your Honor.

N4e2ZhoS kjc

1           THE COURT:  Thank you.

2           Mr. Bachner.

3           MR. BACHNER:  Your Honor, this is a good segue to go

4    into from the factual information into kind of the background

5    of Mr. Zhong.

6           I just want to preface my remarks.  I say this often

7    at sentencing, but I just think it is so appropriate.  I have

8    been doing this for a long time.  I think your Honor and I go

9    back a little bit from the days when you were in the U.S.

10   Attorney's office and I had been doing criminal defense work

11   for a bit and was a prosecutor for a while.  I always remark

12   how hard it is when I was a prosecutor to do my job, how hard

13   it is as a defense lawyer, but whenever I am in front of you,

14   your Honor, or any other judge, frankly, in this district or

15   any other district, I'm always amazed that the difficulty that

16   a Court has, and the Court often struggles with coming up with

17   a fair sentence and trying to figure out, you know, what do

18   you do with the person has committed a crime standing before

19   you and trying to weigh the appropriate punishment that that

20   person should get, particularly defendants in criminal cases

21   who are just often probably some of the most vulnerable people

22   we have sitting there, you know, surrounded by your lawyers.

23   But it's a really -- it's a very vulnerable time for any

24   defendant, and it makes our job sometimes a little more

25   difficult, hoping that we are articulating the arguments in a

N4e2ZhoS kjc

1    way that we mean them, that we are not saying things in a way

2    that come across the wrong way, and trying to, you know,

3    educate the Court to who our client is aside from the person

4    who stole 620,000 Bitcoin from Mr. Ulbricht.

5            So what I want to do, your Honor, is discuss a little

6    bit with you why we believe, your Honor, that a variance in

7    the case to a term that does not include jail but does include

8    a significant portion of home confinement and other types of

9    considerations the Court may deem appropriate is the right way

10   to resolve this case.

11           As Mr. Garland said, there are some disputes that we

12   have with the government, who parenthetically has been a

13   professional pleasure to deal with in this case.  But it is

14   important, your Honor, for us to be able to say that although

15   we have some disagreements, we all agree a variance is

16   appropriate.  It is just how much.  The probation department

17   has indicated that a three-month variance is appropriate,

18   Mr. Felton has agreed that a variance is appropriate, and we

19   agree a variance is appropriate.

20           The question for the Court is whether or not a

21   variance from the 27 months down to a period that does not

22   include jail for a gentleman like Mr. Zhong is a reasonable

23   resolution of the case, given the facts which I would like to

24   discuss with the Court.

25           So, your Honor, the first criteria that you have to

N4e2ZhoS kjc

1    look at under the guidelines is what is the history and

2    characteristics of the defendant as well as the nature and

3    circumstances of the offense.  Mr. Garland has taken the first

4    part off my plate, that is, the nature and circumstances of

5    the offense.  And we all know, your Honor, the wonderful words

6    of Judge Rakoff, who I put in every memo I ever file in this

7    court because I think it is just so emblem -- it is just the

8    emblem of what I think the Court should be thinking of at the

9    time of sentence, and I'm going to take ten seconds and read

10   it, Judge.

11          Judge Rakoff said:  "Surely if ever a man is to

12   receive credit for the good he has done and his immediate

13   misconduct assessed in the context of his overall life

14   hitherto, it should be at the moment of his sentencing, when

15   his very future hangs in the balance.  This elementary

16   principle of weighing the good with the bad, which is basic to

17   all the great religions, philosophies, and systems of justice,

18   was plainly part of what Congress had in mind when it directed

19   courts to consider as a necessary sentencing factor the

20   history and characteristics of the defendant."

21          So in plain English, your Honor, every offender

22   deserves an individual assessment for his conduct, who he is,

23   and how do the scales of justice bear down on that defendant?

24          This Court has had people before it who have plain

25   and simply demonstrated through past conduct that they are not

N4e2ZhoS kjc

1  very nice people.  They have done a lot of bad stuff.  And

2  even they may have some redeeming situations about them.  But

3  they have demonstrated through their conduct that they got a

4  lot of chances in life and they haven't taken advantage of

5  them.

6          And there are some defendants who have committed the

7  same crime but who are not fundamentally bad people, who are

8  fundamentally good people who have also committed what is a

9  crime, and oftentimes the same one.

10          The issue becomes how do we treat these two different

11  people?

12          Jimmy Zhong, your Honor, I submit respectfully to

13  this Court is fundamentally a nice, kind, good guy.  And we

14  were able to submit a bunch of letters from friends who have

15  known him for a while, and they all kind of mirror the same he

16  is a nice, kind guy, he helps people who are in some type of

17  problems, whether it is helping them up the steps or helping

18  them fix something, just his nature of being a kind person.

19          So Judge, in imposing the sentence on Mr. Zhong, the

20  parsimony clause rules the day.  It is the overarching

21  principle, and your Honor is directed -- I'm sorry to be

22  telling you these things that are obvious to the Court, but I

23  did want to put them out there, sufficient but not greater

24  than necessary to meet the goals of sentencing.

25          I have always looked at that, your Honor, as meaning

1    what is the lowest sentence a Court can impose to meet the

2    goals of sentencing?  What is sufficient but not greater than

3    necessary?  And I submit, your Honor, in a case like this, and

4    given Mr. Zhong's background, that a variance to a period that

5    does not include prison but does include a period of

6    significant home confinement meets those goals.

7         So, your Honor, let's talk a little bit about who

8    Jimmy Zhong is.

9         Jimmy is the son of two Chinese immigrants who came

10   to this country and they dedicated themselves to working only

11   and ignoring Jimmy wholly.  Jimmy's dad owned a used goods

12   store.  His mother was a nurse who worked at night.  And from

13   childhood, Jimmy was left to fend for himself.  He never had a

14   single relationship with his parents.  He had no relationship

15   with his sister.  And as long as he can remember, your Honor,

16   his home life was devoid entirely of any segment of love,

17   totally ignored.  Jimmy, your Honor, was kind of like a piece

18   of furniture in the home.  He was attended to when necessary

19   and otherwise ignored.  There was no parental care, and he was

20   utterly devoid of any attention.

21        When he was interviewed by the psychiatrist and we

22   had met with the government, he characterized his life as just

23   utterly miserable.  And what a sad thing for a person to look

24   back at his childhood and say that my life was miserable.

25   What a sad thing for someone to say.

N4e2ZhoS kjc

1          His parents, your Honor, got divorced.  He doesn't

2     even know when that happened because he could have cared less.

3     He had no relationship with either of them.  And I put in the

4     memo that usually the divorce of a parent is such a

5     monumentally significant issue that people remember that.  It

6     impacts them until the day they die.  Jimmy didn't even know

7     when it happened and it had no impact on him at all because

8     these were two strangers essentially to Jimmy.

9          His father gave no financial support when he left.

10    And when his father died, Jimmy didn't even know.  He found

11    out about it just as a matter of, like, just hearing about it.

12    That is just the nature of the relationship that he had with

13    his parents.

14         His mother and sister don't even know he is being

15    prosecuted in this case to our knowledge.

16         And the school life, your Honor, was an extension of

17    that family misery.  Like his parents, who had no friends and

18    no social life, neither did Jimmy and he developed as a result

19    of what he learned at home or didn't learn at home, no social

20    skills.  He was victimized, your Honor, almost on a daily

21    basis at school.  He was bullied from grade school through

22    high school.  And now, your Honor, we live in a world where

23    people take bullying of children a lot more seriously than I

24    think they did maybe ten or 15 years ago, and he suffered

25    enormously from it.  He was continuously punched and assaulted

N4e2ZhoS kjc

almost on a daily basis, and he was ridiculed and humiliated
publicly in high school because he was different.  In his own
words, they said I was fat, they said I was ugly, they said I
was weird.  And they never let him forget it for a day one --
for a day.  He had no one to talk to——no parent to confide in,
no friend to escape to——all the time, your Honor, either
suffering from undiagnosed autism spectrum disorder or
developing that spectrum disorder as a result of the conduct
that he went through.

        That type of impact and that type of torment takes
its toll, your Honor.  It impacts your behavior and it impacts
your judgment and it impacted his.  Those early experiences
never left Jimmy, and it shaped how he dealt with people.  His
extraordinary need to be loved, his extraordinary need to be
liked, for any semblance of attention from anyone.

        And in a letter written to the Court on Jimmy's
behalf, your Honor, one woman wrote, "All he wants in this life
is to love others and for others to love him.  That's all he
was ever really looking for."

        Dr. Norman, who wrote his report on Jimmy, said that
the autism spectrum disorder would make certain social
decisions difficult for Mr. Zhong.  This difficulty would
include making decisions to try and change his social
relationships with others in a nontypical way.  That is, he
has impairments in initiating and maintaining social

N4e2ZhoS kjc

1    relationships in a normal way.  For example, giving away large

2    sums of Bitcoin and possessing large sums of cash were an

3    attempt, albeit atypical, of a way to gain social relatedness.

4    These behaviors are not as much conscious intention on

5    Mr. Zhong's part, but more of a lack of such development

6    consistent with his illness.

7           Jimmy accepts responsibility for what he did.  He

8    knows he shouldn't have taken those coins and he's not trying

9    to shift the blame because he suffers from an autism spectrum

10   disorder.  But it impacted the way he behaved.  It impacted

11   his need to be accepted, and it impacted why he gave away

12   millions of dollars of Bitcoin to friends, to people, to women

13   trying to develop relationships, paying people's gambling

14   debts, buying women Jimmy Choo shoes and Chanel bags.  These

15   types of what Mr. Felton probably correctly characterized as

16   decadent expenses, because in a lot of ways they are, they

17   weren't for Jimmy.  They were for Jimmy to get acceptance and

18   have friendships.  But what for Jimmy was, he bought himself a

19   2008 Lamborghini which crashed, and then he replaced it with

20   insurance money, and he bought a Tesla which cost more than the

21   Lamborghini.  He bought himself a fake Rolex on Silk Road.

22          Jimmy lives in a very modest home in Gainesville, very

23   modest.  Some people would characterize it as less than

24   modest.  He is not somebody, your Honor, even though he spent

25   the $16 million -- and, again, we don't minimize, and your

N4e2ZhoS kjc

1    Honor knows me well enough to know I wouldn't do that to the

2    Court, but at the end of the day, your Honor, this was not --

3    virtually everything Jimmy did, without justifying the

4    conduct, was for the reasons I articulated, and that is, the

5    background he had, the family upbringing he had, the disorder

6    he suffered from, all impaired that judgment, not that he

7    didn't know right from wrong, he knew right from wrong, but

8    how he acted.

9          So, your Honor, that is the young man seated before

10   you who, at the age of 22, in college, when people in college

11   do a lot of stupid stuff, and this was certainly more stupid

12   than what a lot of college people do, he made his friend with

13   the computer, and that's how he mined all that Bitcoin.  And

14   everything he couldn't get at home, he would lock himself in

15   his room and just became enamored with the computer, and

16   that's where he got his solace, and that's where he got his

17   joy.

18         So your Honor, in imposing sentence, your Honor

19   should be considering what the goals of sentencing are.

20   Lawyers call it specific deterrence, number one, that is, what

21   type of sentence should your Honor be imposing to make sure

22   that Jimmy Zhong doesn't break the law again?  If your Honor

23   imposes a sentence that includes jail, we would hope with some

24   type of variance, is that any different -- is the 24 months or

25   the 27 months necessary to send that message as compared to a

probationary sentence for Mr. Zhong to specifically deter him
from committing a crime?

Mr. Zhong is an emotional wreck as a result of his
conduct, as a result of his arrest, as a result of his
prosecution, as a result of the attention that it has
garnered.  His life has become rather public in many ways.
His friends are concerned because their lives have become
public as a result of what Mr. Zhong did.

And he would never, your Honor -- to the extent that
we have to take bets and courts oftentimes just make educated
guesses about the likelihood of someone recidivating and  doing
something again, I think Jimmy is a really good bet, Judge,
that he is not going to break the law again.  We can't
guarantee what's going to happen in life, Judge, but I believe,
respectfully, that Jimmy Zhong has really learned his lesson
and he is not going to be engaging in any type of criminal
conduct again.

And it is important to note the conduct he engaged in
was all related to this Bitcoin stuff.  That's no longer in
his world.  He now has a company where he develops machine
parts.  He is doing, actually, very well.  He's got contracts.
He has people working for him.  Yesterday one of the gentlemen
who has a contract with learned that Jimmy was getting
sentenced and said could you please tell the Court that it's
going to mess up my contracts?  So I told Mr. Zhong I would

N4e2ZhoS kjc

1    tell that to the Court.  That's kind of -- he has those

2    contracts.  He is doing well.  It's a 3D machine.  They make 3D

3    mechanical parts for gears for factories, and he has a real

4    good skill at that.  And that's where he has been spending his

5    time right now, your Honor.

6           So I specifically -- I respectfully submit, your

7    Honor, you shouldn't have to have an enormous concern that

8    Mr. Zhong -- you should have very little concern that

9    Mr. Zhong will commit a crime again.

10          In Mr. Felton's memo, your Honor, he focused on

11   specific deterrence and on general deterrence.  I think we all

12   agree there is no need to rehabilitate Mr. Zhong as a goal of

13   sentencing, and I think we all agree there is no reason to

14   punish him for punishment's sake alone.  There is no reason to

15   incarcerate him to just punish him for what he's done.

16          I think, your Honor that, it should be -- I think we

17   all agree we are talking about specific deterrence and I don't

18   know what the Court is thinking, but as far as how counsel

19   perceives the case, we are looking at specific deterrence and

20   we are looking at general deterrence.

21          So, your Honor, if you talk about general deterrence

22   and incarceration, one of the statistics I always found kind

23   of remarkable, your Honor, is that -- it's changed a little in

24   2021, but prior to 2021, the United States of America, Judge,

25   had 4 percent of the world's population and 25 percent of the

N4e2ZhoS kjc

1    word's incarcerated population, ahead of China.  We were

2    number one on the list.  The United States of America put more

3    people in jail than any country in the world.

4            In 2021, that changed because of the First Step Act

5    and because of the recognition by Congress and by the Courts

6    that we are putting too many people in jail, and we released a

7    lot of people from what were minor narcotics matters and the

8    recognition that probationary sentences and nonincarceratory

9    sentences can make sense.  They do punish people.

10           People who think probation doesn't mean anything,

11   it's a slap on the wrist, have never been on probation.  It is

12   a very strictly monitored procedure.  You can't travel.  You

13   can't do certain things.  This is not like -- the one Second

14   Circuit case referred to it as conditional liberty.  You know,

15   you are on liberty, but it is no party.

16           And putting a fellow like Mr. Zhong on probation is a

17   restriction, particularly if there is home confinement

18   attached, your Honor, is a significant punishment, your Honor.

19   It's not a slap on the wrist for what Mr. Zhong has done.

20           And your Honor, you know, you are aware that the 2023

21   guidelines have come out.  They don't take effect until

22   November.  Mr. Zhong would -- you know, under the new

23   guidelines, there is a recognition that if you fall in

24   particular zones, and even a zone D case under particular

25   circumstances, Congress is now saying to the judges that

N4e2ZhoS kjc

nonincarceratory sentences should be considered in a very

significant way because of the recognition that too many

people are going to jail who don't necessarily have to be

there.

And it's expensive.  It costs $40,000 a year at least

to incarcerate the defendant.  It costs $4,000 a year to put

them on probation.  And there are cases, your Honor, I have

cited them, one case who cites that fact about something the

Court should consider, the financial cost for particular

defendants who either it's a close call or not such a close

call, but whether Jimmy Zhong has to be someone who has to go

to jail and whether that type of expense in addition should be

attached to it.

Your Honor, the Supreme Court in *Gall* was very, very

clear that probationers -- that offenders on probation, the

Supreme Court says, are nonetheless subject to several

standard conditions that substantially restrict their liberty.

They may not leave the judicial district, etc.  And in the

*Gall* case, the Court upheld a probationary sentence for a

defendant who is looking at a fairly substantial guideline

level.

Now, your Honor, as far as general deterrence, again,

I don't think, your Honor, that someone who is inclined --

first of all, this case is so unique on its facts, you know,

who Mr. Zhong took the coins from, the circumstances of how he

N4e2ZhoS kjc

took them, that is, the impulsive nature of how it occurred,
the serendipitous nature of how it occurred, I don't think
that the same type of concerns that Mr. Felton has voiced
about general deterrence really have that same type of
applicability to this type of case, that someone is sitting
back saying oh, geez, if for some reason I am able to get
ahold of some coins that I shouldn't have gotten ahold of, you
know, look what's going to happen.

I think people inclined to commit those types of
predatory offenses don't have the same deterrent issue that we
have in a case like this.  And I don't think that there is a
general -- the general deterrent aspect of this case I just
don't think is that controlling in a case like this.  It
surely must be considered by your Honor.  I just don't think
it should really be -- it should really have to be the
controlling factor in this type of case.

So your Honor, we also have somewhat of a concern
here, Mr. Zhong's emotional condition as a result of his
disorder.  We have -- counsel has, and we ask the Court to
consider this, some type of concern about just how he is going
to do in jail.  How is he going -- how is that emotional
situation going to interact, you know, with other inmates,
with the rules in the jail?  His view of how he deals with
people is just considerably different than how others -- he is
a nice guy, he is a lovely guy, he is a sweet guy, and we just

N4e2ZhoS kjc

1    have concerns about how he will fit in, to be very candid with

2    the Court.

3           That is why, your Honor, we believe strongly, in a

4    case like this, despite the serious nature of this offense—and

5    we don't minimize it and Jimmy did doesn't minimize it—that

6    the goals of sentencing, your Honor, would be met by imposing

7    a sentence that punishes Jimmy for what he did and takes into

8    consideration, we ask the Court, in a creative way, that this

9    was a fairly unique type of case.  And your Honor is aware of

10   the sentences imposed in this district in cases which I would

11   argue to the Court are substantially more serious, meaning

12   that the victims were victims of investor fraud, market

13   manipulation, theft, where there have been substantial,

14   substantial departures from hundreds of months to 18 to 24

15   months, the same type of range that Mr. Zhong looks at now

16   starting.

17          We ask the Court, your Honor, to impose a sentence on

18   him, again, that will allow him to continue with his life,

19   continue with his work, continue with the company he has now

20   started up, and allow him the benefit, your Honor, of

21   remaining as productive as possible among us.

22          And last, Judge, and Mr. Zhong is going to say this

23   to you, the closest thing he has in the world to him is his

24   dog Chad.  I'm not a dog owner, and I'm not an animal owner,

25   but I know to people who do own animals, they are oftentimes

N4e2ZhoS kjc

1    like their children.  Chad is sick, has a feeding tube right

2    now.  And I don't mean to minimize or -- the fact of the

3    matter is, Mr. Zhong takes care of this dog.  I mean, he has

4    someone he took over to the house now to watch the dog.  And

5    when you speak to him, one of his greatest concerns is, you

6    know, who is going to take care of Chad?

7         So I understand, your Honor, that when you sentence

8    people there are people with family members who are sick, I

9    get it, but this is a family member to him, your Honor, and I

10   thought it was appropriate to at least let your Honor know

11   what -- kind of what his concerns are, as well.

12        So anyway, Judge, I thank you so much for listening

13   to the argument.  I hope I have been persuasive in -- with the

14   Court in helping to appreciate the kind of person Jimmy is,

15   the circumstances that he had, and I am hopeful, your Honor,

16   that you agree with counsel that this is one of those cases

17   where varying from 27 months to a term of probation and home

18   confinement is within the appropriate sentencing discretion

19   your Honor has and is consistent with the parsimony clause of

20   imposing a sentence that is sufficient but not greater than

21   necessary to meet the goals of sentencing.

22        Thank you.

23        THE COURT:  Mr. Zhong, is there anything you wish to

24   say before the Court imposes sentence?

25        THE DEFENDANT:  Your Honor, it is very difficult for

N4e2ZhoS kjc

me to speak here in front of you in this open court.  I am by
nature extremely uncomfortable in my own skin.

I am here, I am here today with the absolute shame
and remorse for my conduct.  With your permission, I want to
apologize to the U.S. government and everyone involved for all
the hard work they put in to make me to do the right thing,
and thank the prosecution, the F.B.I., the IRS for the
professional way they have treated me in the investigation.

Your Honor, as my attorney said, over ten years ago
when I discovered a flaw in the Silk Road platform, Bitcoin
itself was only a little over two years old.  No one really
knew what it was or was going to be.  When I stole the 50,000
Bitcoin from Silk Road, I knew what I did was wrong but I
justified my actions to myself thinking that Ross Ulbricht
committed crime to get the Bitcoin, so it was okay for me to
take some from him.  I thought that since Ulbricht contacted
me and thanked me for explaining the flaw to him and by
sending me more Bitcoin, it was okay.  However, I now clearly
see those are all just justifications to protect myself.  I
should have recognized seriousness of stealing the Bitcoins
when I took them.

I can't blame my choices on my youth at the time I
took them because I didn't just take them.  I kept most of the
Bitcoins for almost a decade as their value sored beyond what
I ever expected, into the billions.  I knew that holding onto

N4e2ZhoS kjc

the coins was wrong.  I should not have spent any of it.  I

should have spoken to an attorney and figured out how to

handle it, but I did not.  I think I buried my head in the

sand because just having the coins made me feel important and

worth something.

Over 2,000 Bitcoin, worth millions of dollars at the

time, are now gone because I spent them, gave them away, or

they were stolen from my house.  The vast majority of what I

spent was on friends and in unsuccessful attempts at forming

relationship.  Even the items I bought for myself were an

attempt to impress people.  Few people ever cared about me

before I was able to buy things for them.  That was my mindset

at the time.  It was wrong of me.  I should not have done

anything with them or even possessed them so that they could

be stolen because they were not mine.

I am lucky that several college friends have stuck by

me through this, and I want to apologize to them for the

scrutiny I put them under by the government and the media.

Your Honor, right now the dearest, closest thing that

I have to me is my dog Chad.  He is the only one in my life

that's always been there for me.  Now he is old and sick, and

he has a feeding tube.  I care for him above all else.  I have

no one else to take care of him for me.  I know it may seem

odd at this time, but I ask you to please consider him as well

in whatever sentence you may impose.

N4e2ZhoS kjc

1        Your Honor, your Honor, I always knew that what I did

2   was wrong.  I never forced myself to wrestle with the truth of

3   how serious it was.  It wasn't until agents showed up at my

4   house to search that I was forced to confront the gravity of

5   my actions.  Not a day goes by I don't think about the crime I

6   committed, choices I made, how I deceived myself into thinking

7   it was all okay when it was not.  I am the only one

8   responsible for where I am now.  I now accept that I must be

9   punished.

10        I know I cannot change the past, but I commit to

11  everyone that I will never break the law again.  I will live a

12  law-abiding life, as I am now, running my CNC machining

13  business that continues to grow.

14        Your Honor, I know my conduct in this case is not a

15  reflection of the man I am.  I beg you to have faith in me.

16        Thank you for providing me a chance to speak on my

17  behalf.

18        THE COURT:  I will hear from the government.

19        MR. FELTON:  Thank you, your Honor.

20        As the Court knows, we are seeking a custodial

21  sentence here; but, largely due to the defendant's assistance

22  in accessing his crime proceeds, we are seeking a sentence

23  that is below probation's recommended sentence of 24 months.

24        I am not going to repeat everything in our lengthy

25  sentencing submission, your Honor.  I am just going to try and

N4e2ZhoS kjc

point out a few different things as the Court considers the

3553(a) factors here, and of course I will answer any

questions that the Court has.

On the offense conduct here, this wasn't just a

one-time mistake.  The defendant made not one bad decision,

but a host of bad decisions over a nearly ten-year period.

Between the 2012 wire fraud and the time of the November 2021

search, the defendant masterfully concealed what he had done

and where his Bitcoin came from.

We do disagree with defense counsel that the

concealment of the offense in the years after the wire fraud

was quite complex.  To frustrate law enforcement tracing

efforts, he used a decentralized Bitcoin mixer, he used an

overseas cryptocurrency exchange when he converted the Bitcoin

Cash to Bitcoin.  That was intentional.  He was untruthful to

a domestic cryptocurrency exchange about where some of his

holdings came from, falsely claiming that those were trading

profits and Bitcoin that he had personally mined when they

actually came from the Silk Road.  And he used an impressive

array of technological tools, including virtual private

networks, virtual private servers, virtual machines, and all

other kinds of state-of-the-art tools that he bragged about on

message boards to keep his identity a secret.  And while we

disagree with defense counsel on this point, I do want to note

parenthetically, along the lines of what defense counsel have

N4e2ZhoS kjc

1    said, they have been a class act and a true pleasure to deal

2    with in this case.

3            So this wasn't a one-time laps in judgment.  Day in

4    and day out, particularly from August 2017 until the search in

5    November of 2021, he made a conscious and deliberate choice to

6    benefit from his crime.  The original wire fraud as well as

7    the more sophisticated laundering conduct over the following

8    nine plus years was designed to evade detection.

9            Another factor that in our view warrants jail time is

10   the 4 percent of the crime proceeds that he dissipated.  And

11   while 4 percent may not sound like a lot, in a case involving

12   3.4 billion dollars of crime proceeds, of course that's quite

13   a significant amount.  He used those on lavish expenses for

14   himself and for others.  I won't go through all the expenses

15   that I chronicled in the sentencing submission, but we note

16   there that over the four plus years before the search, he used

17   crime proceeds on $9.5 million in real estate investments,

18   hundreds of thousands of dollars to yacht and private jet

19   companies, tens of thousands of dollars at the Plaza, Four

20   Seasons, Ritz Carlton, Waldorf Astoria, he stayed at Regis

21   Hotels, and some of the luxury brands, like Louis Vuitton,

22   that we mentioned and heard about earlier today.

23           While the defendant was young at the time of the

24   fraud, as he grew older, he didn't do anything to rectify his

25   crime.  His spending only escalated over time up until the

1   search.  And of course, based on the price of Bitcoin the day

2   of the search, the 2,149 Bitcoin approximately that the

3   defendant dissipated, that would have been valued at over $142

4   million, and a $142 million crime is a very significant crime,

5   your Honor.  Even today based on the price of Bitcoin the

6   dissipated proceeds are worth a little over $65 million at last

7   check.

8           With regards to the technical assistance, I want to

9   be clear, he deserves real and substantial credit for this.

10  That's why we exercised our discretion to allow him to plead

11  guilty to wire fraud and not money laundering and that's the

12  main reason why we are seeking the sentence below the

13  guidelines and even below probation's recommendation.

14          That said, he didn't voluntarily turn the Bitcoin

15  over to law enforcement.  Law enforcement found it and seized

16  it pursuant to court-ordered search warrants.  The day of the

17  search, the defendant provided zero assistance.  And by the

18  time he ultimately relinquished all of the information needed

19  to fully control the Bitcoin, months after the search, he did

20  so only once he knew that he almost certainly would never be

21  able to control it himself again or access it.

22          Had law enforcement not tracked down Zhong and his

23  billions of dollars of crime proceeds we wouldn't be here

24  today.  There is no indication that his pre-search behavior

25  would have changed absent these law enforcement efforts.  He

N4e2ZhoS kjc

might still be pending his crime proceeds on yachts and
private jets, still using decentralized Bitcoin mixers and
overseas exchanges before stealthily introducing his crime
proceeds into the banking system and economy and keeping the
rest, until he needed it, inside that popcorn tin.

He was nearly flawless in concealing his crime for
over nine years.  One of his very few mistakes involved a
microscopic portion of the crime proceeds.  Less than
one-tenth of a single Bitcoin in 2019 the defendant moved to
an address that law enforcement knew he controlled.  We are
talking about hundreds of dollars worth of Bitcoin in a
multibillion dollar case.  Had he not done that, we might not
be here today.

On deterrence, your Honor, we think both specific and
general deterrence are factors here.  I think we emphasize
general deterrence a little more.

On specific deterrence, again, he masterfully hid
what he did for over nine years.  Despite having in-demand
skills, he didn't work.  He lived an elaborate lifestyle, at
least had elaborate spending habits, and he boasted about it.
He didn't express any remorse for what he did, for spending
over $16 million of crime proceeds until he was caught and we
know he has done so today, but he didn't until he was caught.

On general deterrence, your Honor, we think this is a
compelling factor that warrants imprisonment.  After the fact

N4e2ZhoS kjc

1    even the most complex cases can look pretty simple.  But

2    figuring out who was responsible for this offense and who

3    controlled the crime proceeds here was anything but.  This is

4    extremely difficult and costly to detect.  When someone

5    obtains cryptocurrency that belongs to someone else,

6    regardless of who they are, especially on this scale, with

7    years of concealment and extensive spending, that conduct, in

8    the government's view, respectfully, ought to be severely

9    punished at least with some term of imprisonment in order to

10   discourage others who are tempted to commit similar crimes.

11   We otherwise risk people taking a look at the facts of a case

12   such as this and saying, I will continue to commit cyber

13   frauds, I will continue a scheme to obtain a large amount of

14   cryptocurrency, continue spending millions of dollars on

15   luxury items, and if I get caught, well, I guess I will just

16   have to give back whatever I haven't spent and I will just get

17   probation and say I won't do it again.  Respectfully, your

18   Honor, imprisonment is warranted here for general deterrence

19   reasons.

20           At the end of the day, the defendant committed a

21   cyber robbery of someone who he was purchasing drugs from,

22   spent over $16 million of these crime proceeds, deprived the

23   government of crime proceeds that it was entitled to, that

24   would have been valued at over $142 million at the time they

25   would have been seized, and the defendant used his vast

N4e2ZhoS kjc

1   technical skills to conceal and benefit from this crime for

2   nearly a decade.

3          On this record, this conduct, even with the

4   substantial mitigating factors that are present that we

5   acknowledge and that we considered, we think this conduct

6   warrants a jail sentence.

7          Thank you.

8          MR. GARLAND:  Your Honor, may I take a brief second?

9          THE COURT:  Sure.

10          MR. GARLAND:  If I didn't make it clear in my original

11   presentation, of that $16 million, around 9.5 million was spent

12   on his 80 percent interest in RE&D Investments which has

13   substantial real estate holdings in Memphis worth millions of

14   dollars that the government has under their control.

15          THE COURT:  Okay.

16          MR. GARLAND:  Thank you, your Honor.

17          THE COURT:  In deciding upon an appropriate sentence,

18   I have considered all of the factors listed in Title 18 United

19   States Code § 3553(a), including the nature and circumstances

20   of Mr. Zhong's offense, his personal history and

21   characteristics, the need for the sentence imposed to reflect

22   the seriousness of the offense, the need to promote respect

23   for the law, to provide just punishment, and to afford

24   adequate deterrence, both specific and general.

25          As to the nature and circumstances of the offense,

N4e2ZhoS kjc

1   Silk Road was an online dark web black market created by Ross

2   Ulbricht, and it was operated by him from approximately 2011

3   until 2013.  Silk Road allowed its hundreds of thousands of

4   users to buy and sell illegal drugs along with other illicit

5   goods and services online and anonymously.  The only form of

6   payment accepted on Silk Road was Bitcoin, which is a digital

7   cryptocurrency.

8           In order to make purchases and sales on Silk Road,

9   users were required to maintain a Bitcoin address associated

10  with a user's account.  These addresses were stored on wallets

11  maintained on computer servers controlled by Silk Road.  To

12  purchase any of the drugs or other products sold on Silk Road,

13  users had to fund their wallets with Bitcoin; and after making

14  a purchase, Silk Road would hold the appropriate quantity of

15  Bitcoin in escrow, pending the completion of the transaction,

16  at which point the Bitcoin would transfer to the seller's

17  wallet.

18          Accordingly, Silk Road's payment system required

19  Silk Road to hold large quantities of Bitcoin on its servers

20  at any given time.  Silk Road was operated on the Tor network

21  and used Bitcoin tumblers, a process involving the creation of

22  randomized dummy transactions to facilitate user anonymity and

23  evade law enforcement.

24          Between 2011 and he 2013, more than 1 1/2 million

25  illicit transactions took place over Silk Road involving 9.9

N4e2ZhoS kjc

1   million Bitcoin.  These transactions earned Ulbricht and

2   Silk Road commissions of approximately 640,000 Bitcoin.

3        Ulbricht was identified and arrested in October 2013.

4   He was convicted at trial in February 2015 of, among other

5   things, distributing narcotics over the Internet, operating a

6   continuing criminal enterprise, and conspiracy to commit money

7   laundering.  As we have heard, he was sentenced to life

8   imprisonment without the prospect of parole in May of 2015.

9   Judge Forrest, who was the presiding judge in that case, also

10  ordered forfeiture of all funds that had passed through

11  Silk Road.

12       Mr. Zhong became familiar with Silk Road through his

13  purchases of small amounts of cocaine on the site for his

14  personal use.  At some point in or around September 2012,

15  prior to Ulbricht's arrest, Mr. Zhong had accidentally

16  discovered a glitch in Silk Road's payment transaction system.

17  He was withdrawing Bitcoin from the Silk Road system and

18  accidentally double clicked during that process.  As a result

19  of double clicking at that moment, he received twice the

20  amount of Bitcoin that he had been anticipating.

21       In late September 2012, Mr. Zhong decided to exploit

22  this glitch in  the Silk Road system.  He created nine

23  accounts on Silk Road in late September 2012 and funded them

24  with between 200 and 2,000 Bitcoin.  Shortly after making the

25  deposits, he then quickly effectuated numerous withdrawals of

N4e2ZhoS kjc

1    Bitcoin, and the accounts he created were each credited with a

2    multiple of his original deposit.

3          Over a period of a few days, Mr. Zhong stole

4    approximately 50,000 Bitcoin.  At that time, the 50,000

5    Bitcoin had a value of about $620,000.  After acquiring the

6    50,000 Bitcoin, Mr. Zhong did not further victimize the site,

7    nor did he spend the Bitcoin.  Instead, he periodically

8    transferred the stolen Bitcoin to different Bitcoin addresses

9    and he took steps to disguise and conceal his possession of

10   it.

11         As a result of his possession of the 50,000 stolen

12   Bitcoin, in August 2017, Mr. Zhong received a matching

13   quantity of a related cryptocurrency, 50,000 Bitcoin Cash, in

14   what is referred to as a "hard fork coin split."  Believing

15   that Bitcoin was a better investment than the new Bitcoin Cash

16   Cash, Mr. Zhong later exchanged the 50,000 Bitcoin Cash for

17   3500 Bitcoin.

18         As we have heard, the value of Bitcoin experienced a

19   meteoric rise between 2012 and 2021.  After Ulbricht's arrest,

20   the government began intensive research into the records of

21   Silk Road.  In 2019, investors focused on the whereabouts of a

22   missing 53,500 Bitcoin.  This 53,500 Bitcoin was "directly

23   forfeitable property that was involved in or traceable to

24   Ulbricht's crimes," citing the presentence report at paragraph

25   24.

N4e2ZhoS kjc

1              The government's investigation ultimately led to the

2       issuance of a search warrant for Mr. Zhong's home on November

3       9, 2021.  In executing the search warrant, agents seized

4       approximately 50,491 Bitcoin traceable to Ulbricht's crimes

5       from Mr. Zhong's home valued on that day at approximately 3.35

6       billion.  Ledgers recovered from Mr. Zhong's home also

7       indicate that he "pushed some of" the approximately 50,000

8       fraudulently obtained Bitcoin "through a decentralized Bitcoin

9       mixer" which is a computerized service used to conceal the

10      ownership of Bitcoin, citing the presentence report, paragraph

11      50 and note 2.

12              In March and May of 2022, Mr. Zhong voluntarily

13      surrendered to the government an additional more than 860

14      Bitcoin he had stolen from Silk Road in September of 2012.

15      The government estimates that Mr. Zhong preserved

16      approximately 96 percent of the Bitcoin he had stolen from

17      Silk Road.  In addition to the Bitcoin, agents recovered

18      $661,900 in cash from Mr. Zhong's home along with other

19      cryptocurrency as well as gold and silver bars.

20              In April and June 2022, Mr. Zhong also surrendered to

21      the government more than 142 additional Bitcoin not traceable

22      to Silk Road.  As to Mr. Zhong's personal history and

23      characteristics, he is 32 years old.  He was born in

24      New Jersey and grew up in Lawrenceville, Georgia.

25              As we have heard, his mother and father were born in

N4e2ZhoS kjc

China.  His father operated a small thrift shop and his mother

worked nights as a nurse.  Mr. Zhong reports that he had no

relationship with either his father or his mother when he was

growing up and that he was left to fend for himself.  He left

home for college at 18 and never returned.  Mr. Zhong's father

is deceased.  He has had no contact with his mother or his

younger sister.

Mr. Zhong reports that while in school he was bullied

and teased about his weight and his clothing, which came from

his father's thrift shop.  The defendant reports that he had

no friends and spent most of his time when not in school in

his bedroom with his computer.  He taught himself computer

coding while still in middle school.

As far as academics, Mr. Zhong excelled, and he won a

scholarship to the University of Georgia, where he obtained a

bachelor's degree in computer science.  While still in

college, Mr. Zhong made large amounts of money from Bitcoin

mining.

His social problems continued, however.  Mr. Zhong is

single, has never been married, has no children, and has

resided alone in Gainesville, Georgia, since approximately

2017.

As to mental health, I have reviewed a report

prepared by a psychiatrist retained by the defense,

Dr. Matthew Norman.  Dr. Norman concludes that Mr. Zhong

N4e2ZhoS kjc

1  suffers from autism spectrum disorder.  Dr. Norman reports

2  that Mr. Zhong exhibits "significant abnormalities in social

3  interactions, as evidenced by his lack of normal social and

4  peer relationships.  His social relationships and

5  connectedness are nearly nonexistent."

6      Dr. Norman performed a number of tests on the

7  defendant that confirm his autism diagnosis.

8      As to employment, from 2012 to 2021, Mr. Zhong lived

9  primarily off of his Bitcoin mining; and prior to 2017, his

10  income came from the sale of legitimately obtained Bitcoin.

11      In 2017, however, Mr. Zhong sold some of the Bitcoin

12  he had stolen from Silk Road.  Even after that time, however,

13  a significant amount of the defendant's income was derived

14  from his sale of legitimately obtained Bitcoin.

15      Currently Mr. Zhong derives income from a rental

16  property he owns in Athens, Georgia, as well as from a metal

17  cutting parts business that we talked about earlier.  He's also

18  worked as an Uber and Lyft driver.

19      To summarize, the guidelines recommend a sentence of

20  27 to 33 months' imprisonment.  The probation department has

21  recommended a variance down to 24 months' imprisonment, citing

22  Mr. Zhong's autism diagnosis, the lack of love and affection

23  in his family life, the unplanned nature of his crime, the

24  fact that he has not engaged in any other criminal activity

25  since stealing the Bitcoin so many years ago, and the fact

N4e2ZhoS kjc

1   that there are no innocent victims in "need of justice or that

2   need to be made whole financially."

3          The probation department also notes that, as a result

4   of Mr. Zhong's fraud, the government has made a "staggering

5   monetary recovery."  If the Bitcoin that Mr. Zhong stole had

6   been seized at the time of Ulbricht's arrest, it would have

7   been worth a small fraction of the 3.5 billion it was worth at

8   the time of the government's seizure in late November 2021.

9   In this regard, the probation department emphasizes that

10  Mr. Zhong preserved more than 96 percent of the Bitcoin he

11  stole over the decade he possessed it.

12         Finally, the probation department cites Mr. Zhong's

13  cooperation with the government in passing control of billions

14  of dollars worth of Bitcoin to the government, citing the

15  presentence report, paragraph 143.

16         The government agrees that a downward variance is

17  appropriate and that a sentence of 24 months' imprisonment,

18  which is the bottom of the guidelines range, would be

19  excessive.  Nonetheless, the government seeks an incarceratory

20  sentence.

21         The defendant seeks a nonincarceratory sentence.

22         With all of this in mind, I will now describe the

23  sentence I intend to impose, and I will ask the parties if

24  there is anything further they wish to say.

25         The aggravating factors here are that while Mr. Zhong

N4e2ZhoS kjc

1  accidentally discovered the glitch in Silk Road's Bitcoin

2  withdrawal system, he then repeatedly and intentionally

3  exploited that glitch to the tune of 50,000 Bitcoin, then

4  worth about $620,000.  As we have heard, he stole this Bitcoin

5  over several days in September 2012.  Over the next nine

6  years, he repeatedly transferred the Bitcoin he had stolen to

7  other Bitcoin addresses.  Indeed, he took steps over those

8  nine years to cover up his theft and continued possession of

9  the stolen Bitcoin.  All of this was quite intentional,

10  deliberate conduct reflected in detailed ledgers that Mr. Zhong

11  maintained on his laptop, and it continued for many years, from

12  2012 until the search warrant was executed at Mr. Zhong's home

13  in November 2021.

14       While Mr. Zhong initially didn't spend the stolen

15  Bitcoin, in the last four years prior to the execution of the

16  search warrant, he spent about $16 million of the stolen

17  Bitcoin, using the money to purchase several luxury cars, to

18  make real estate investments, and for travel, hotels, and

19  nightclubs.  But for the search warrant, there is no reason to

20  believe that Mr. Zhong ever would have come forward to

21  surrender the stolen Bitcoin.

22       In mitigation, there is the fact that Mr. Zhong did

23  not initially set out to steal from Silk Road.  He discovered

24  the glitch in the Silk Road system by accident.  It was only

25  then that he decided to exploit that vulnerability.

N4e2ZhoS kjc

1          There is also Mr. Zhong's autism and his terrible

2    childhood.  There is also the fact that Silk Road was a

3    criminal enterprise and that none of the Bitcoin that

4    Mr. Zhong stole was actually the property of Silk Road.  All

5    of the funds that passed through Silk Road were legally the

6    property of the United States because all or nearly all of the

7    transactions that took place on Silk Road were unlawful.  The

8    United States was thus the victim here and not Ross Ulbricht.

9          There is also the fact that Mr. Zhong cooperated with

10   the government after the search warrant was executed and the

11   Bitcoin was seized.  It was only as a result of Mr. Zhong's

12   cooperation that the government was able to establish control

13   over the stolen Bitcoin, then valued at $3.35 billion.  That

14   amount is, of course, vastly more than what the government

15   would have obtained if it had seized the same Bitcoin from

16   Ulbricht at the time of his arrest in October 2013.

17         Having considered what are truly unique

18   circumstances, I believe that a sentence within the guidelines

19   range of 27 to 33 months' imprisonment would be excessive,

20   particularly in light of the defendant's autism diagnosis and

21   the fact that imprisonment is likely to be far more difficult

22   for him than for the typical defendant.

23         I also believe, however, that a nonincarceratory

24   sentence is not appropriate, given the highly sophisticated

25   and intentional nature of the defendant's crime, his active

N4e2ZhoS kjc

1    concealment of his possession of the stolen Bitcoin for more

2    than nine years, and the fact that he chose to liquidate and

3    spent $16 million of the stolen Bitcoin.

4           I also agree with the government that there is a

5    crying need here for general deterrence.  While the victim in

6    this case happened to be a criminal enterprise, the victim

7    tomorrow could be a legitimate business.  We must impose a

8    sentence sufficient to deter others with the highly

9    sophisticated skills that Mr. Zhong has from committing

10   similar offenses.

11          For all of these reasons, I intend to impose a

12   sentence of a year and a day imprisonment.

13          With respect to supervised release, I intend to

14   impose a term of three years on the following conditions:

15          Mr. Zhong will not commit another federal, state, or

16   local crime.

17          He will not illegally possess a controlled substance.

18          He will refrain from the unlawful use of a controlled

19   substance.

20          I intend to suspend the mandatory drug testing

21   condition in favor of a special condition requiring drug

22   treatment and testing.

23          Mr. Zhong will cooperate in the collection of DNA as

24   directed by the probation officer.

25          I intend to impose the standard conditions of

N4e2ZhoS kjc

1    supervised release set forth in the presentence report along

2    with the following special conditions:

3         Mr. Zhong will perform 250 hours of community

4    service.

5         He will submit his person and any property,

6    residence, vehicle, papers, computer, other electronic

7    communication and data storage devices, cloud storage or media

8    and effects to a search by any U.S. probation officer where

9    there is a reasonable suspicion that the violation of the

10   conditions of supervised release has taken place.  Failure to

11   submit to a search may be grounds for revocation.  Mr. Zhong

12   will warn any other occupants that the premises may be subject

13   to search pursuant to this condition.  Any search shall be

14   conducted at a reasonable time and in a reasonable manner.

15        Mr. Zhong will participate in an outpatient mental

16   health treatment program approved by the U.S. Probation

17   Office.  I authorize the release of any available

18   psychological and psychiatric evaluations and reports to the

19   healthcare provider.

20        Mr. Zhong will participate in an outpatient treatment

21   program approved by the U.S. Probation Office to include

22   testing to determine whether he has reverted to the use of

23   drugs.

24        Mr. Zhong will provide the probation officer with

25   access to any requested financial information and he will not

N4e2ZhoS kjc

1   incur new credit charges or open additional lines of credit

2   without the approval of the probation officer.

3          It is my intention that Mr. Zhong be supervised by

4   the district of his residence.

5          As to a fine, the guidelines range is $10,000 to

6   $100,000.  Mr. Zhong completed a financial statement claiming

7   assets totaling $1,647,770.55, citing the presentence report

8   paragraph 111.  Based on the information available to me, I

9   conclude that he has not demonstrated an inability to remit a

10  fine.  The probation department has recommended that I impose

11  a fine of $10,000.  While acknowledging the enormous

12  forfeiture in this case, a fine is appropriate given the

13  circumstances, including the defendant's decision to spend $16

14  million worth of the Bitcoin he had stolen.  Accordingly, I

15  intend to accept the probation department's recommendation and

16  to impose a fine of $10,000.

17         I am required to impose a $100 special assessment.

18         As to forfeiture, I entered a final order of

19  forfeiture on March 14, 2023, which provides for the

20  forfeiture of Bitcoin, physical Bitcoin, as well as the cash,

21  gold, and silver seized from the defendant's home, and his

22  interest in RE&D Investments.  In a prior consent preliminary

23  order of forfeiture, the defendant had agreed to the

24  forfeiture of these items, plus the entry of a money judgment

25  in the amount of $42,747,425.95.

N4e2ZhoS kjc

1          Restitution is not applicable in this case because

2     all victim losses, as I mentioned, are directly forfeitable

3     proceeds of criminal activity.

4          Mr. Bachner, is there anything further you wish to

5     say?

6          MR. BACHNER:  No, your Honor.

7          As far as the surrender date, I don't think the

8     government is asking for any change in bail status.  Your

9     Honor, if we could have perhaps just a little bit longer of a

10    surrender date so he can take care of this situation with his

11    dog, we would greatly appreciate it.

12         THE COURT:  And what do you have in mind, Mr. Bachner?

13         MR. BACHNER:  How much, your Honor, would you normally

14    provide?

15         THE COURT:  Well, there is nothing normal about this

16    case.  I was thinking about 90 days.

17         MR. BACHNER:  I think 90 days would be fine, your

18    Honor, and if for some reason something extenuating happens,

19    we will advise the Court and you can make a decision at that

20    point, if that's okay with your Honor.

21         THE COURT:  It is.

22         MR. FELTON:  The government has no objection, your

23    Honor.

24         THE COURT:  Thank you, Mr. Felton.

25         Anything else from either Mr. Bachner or --

N4e2ZhoS kjc

| | |
|---|---|
| 1 | MR. BACHNER:  No, your Honor.  We don't have |
| 2 | administratively any recommendation at this point, so I guess |
| 3 | a jail, like, near his home is fine, Judge, and if we think of |
| 4 | anything in the interim within the next 24 hours or so, by |
| 5 | Monday we will let you know, if that's okay. |
| 6 | THE COURT:  That's fine. |
| 7 | MR. BACHNER:  Thank you. |
| 8 | THE COURT:  Mr. Zhong, is there anything further you |
| 9 | wish to say? |
| 10 | THE DEFENDANT:  No, your Honor. |
| 11 | THE COURT:  Mr. Felton, anything else for the |
| 12 | government? |
| 13 | MR. FELTON:  No, your Honor.  There are no open |
| 14 | counts, for the record, and the Court may just wish to advise |
| 15 | the defendant of his right to appeal, that's all. |
| 16 | THE COURT:  All right.  Mr. Zhong, for the reasons I |
| 17 | just stated, it is the judgment of this Court that you be |
| 18 | sentenced to a year and a day imprisonment and three years |
| 19 | supervised release.  Your term of supervised release will be |
| 20 | subject to the mandatory, standard, and special conditions I |
| 21 | just mentioned.  You are ordered to pay a fine of $10,000 and |
| 22 | a special assessment in the amount of $100.  Forfeiture is |
| 23 | imposed as set forth in the orders of forfeiture that I |
| 24 | mentioned a moment ago. |
| 25 | I do recommend to the Bureau of Prisons that Mr. Zhong |

N4e2ZhoS kjc

1    be incarcerated as close as possible to his home in Georgia so

2    that he may maintain ties with his friends during his period

3    of incarceration.

4            I am going to set surrender date of July 14, 2023.

5    It is my expectation that Mr. Zhong will be designated to a

6    facility by July 14, 2023.  However, if he has not been

7    designated to a facility by July 14, 2023, he will surrender

8    to the United States Marshal for this district by 2:00 on that

9    day.

10           Mr. Zhong, were you not to surrender on July 14,

11   2023, by 2 p.m., you would be committing another federal crime

12   for which you could receive a separate and consecutive

13   sentence.

14           I am required to advise you of your appeal rights.

15   You can appeal your conviction if you believe that your guilty

16   plea was unlawful or involuntary or if there was some other

17   fundamental defect in the proceedings that was not waived by

18   your guilty plea.  You also have a statutory right to appeal

19   your sentence under certain circumstances.  With few

20   exceptions, any notice of appeal must be filed within 14 days

21   of judgment being entered in your case.  Judgment will likely

22   be entered on Monday.  Your attorneys will discuss with you

23   whether or not you wish to file a notice of appeal.  If you

24   are not able to pay the costs of an appeal, you may apply for

25   leave to appeal *in forma pauperis*.  If you request, the Clerk

N4e2ZhoS kjc

1   of Court will prepare and file a notice of appeal on your

2   behalf.

3           Mr. Felton, is there anything else for the

4   government?

5           MR. FELTON:  No, your Honor.  Thank you.

6           THE COURT:  Mr. Bachner, anything else for the

7   defense.

8           MR. BACHNER:  No, your Honor.  Thank you so much.

9           THE COURT:  All right.  Thank you.  We are adjourned.

10                          oOo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25